73 255
a185US364
a46Led949
a22 SC 673
74 450
74 451

73 255
76 102
f76 252

73 255
77 48

THE STATE OF CONNECTICUT *vs.* THE TRAVELERS INSUR-
ANCE COMPANY.

First Judicial District, Hartford, May Term, 1900.
ANDREWS, C. J., TORRANCE, BALDWIN, HAMERSLEY and HALL, Js.

Unless restrained by some constitutional provision, the General Assem-
bly of Connecticut is responsible only to its constituency for the
wisdom and utility of its exercise of the legislative power of taxa-
tion.

Neither the Constitution of this State nor that of the United States
contains any provision, express or implied, requiring taxation to
be equal and uniform. An attack, therefore, upon the validity of
a statute, which rests upon the lack of such equality and uniform-
ity, must fail; unless, indeed, the statute, although in the form of
a tax law, is in purpose and effect an act of confiscation, or is in
direct violation of some constitutional guaranty.

A method of taxing local corporations which divides their stockholders'
into two classes, one of which, composed of residents of this State,
is subjected to municipal taxation, and the other, consisting of non-
residents, to a State or special tax, is not in conflict with Art. 4, § 2,
of the Federal Constitution, entitling citizens of each State to all
privileges and immunities of citizens in the several States, nor with
any provision of the Fourteenth Amendment, merely because the
rules for fixing the valuation of the stock are not the same for each
class, in consequence of which the non-residents may be compelled
to pay at a higher rate than residents. The discrimination is not
directed against the non-residents, as such, but is merely incidental
to a *bona fide* scheme of taxing property which cannot be listed for
municipal assessment. Moreover, such discrimination is one to
which the stockholders are bound to submit by reason of their ac-
ceptance and enjoyment of the grant of special corporate privi-
leges.

Section 3836, as amended by Chap. 63 of the Public Acts of 1889, pro-
vides that the stock of certain corporations owned by Connecticut
residents shall be placed in their lists at its market value in the
towns where they reside, but that "so much of the capital of any
such company as may be invested in real estate, on which it is as-
sessed and pays a tax, shall be deducted from the market value of
its stock in its returns to the assessors." *Held* that this statute
treated the shareholder as owner, not of property distinct from
that of the corporation, but of a proportional part of its capital, in
the valuation of which for municipal taxation a *pro rata* deduction

should be made of so much as was then invested in land upon which the corporation was assessed and paid a tax.

Argued May 1st—decided October 17th, 1900.

ACTION to recover the amount of a tax claimed to be due from the defendant upon shares of its stock owned by non-resident stockholders, brought to the Superior Court in Hartford County and tried to the court upon the plaintiff's demurrer to the answer; the court, *Roraback, J., pro forma*, sustained the demurrer and rendered judgment for the plaintiff, and the defendant appealed for alleged errors in the rulings of the court. *No error.*

The complaint alleged that on October 1st, 1898, eighteen hundred and seventy-eight shares of the defendant's stock belonged to stockholders residing without this State; that the market value on said day of each share was $250; that the defendant had never paid any part of the tax due the plaintiff under the provisions of Chap. 153, § 2, of the Public Acts of 1897, although said tax was due October 20th, 1898.

The answer alleged that the defendant's capital stock consisted of 10,000 shares; that on October 1st, 1898, one thousand seven hundred and ninety-nine of these shares were owned by residents of other States who were citizens of the States in which they resided; that on said date the defendant had investments in real estate upon which it was assessed and paid taxes, *viz*, two pieces of real estate situate in this State, of the market value of $137,965.81, and 948 pieces of real estate situate in other States, of the market value of $1,640,696.24, such market value being the amount respectively at which said investments in real estate were on October 1st, 1898, carried on the books of the defendant; that the resident owners of the defendant's stock were, on said date, assessed upon the stock owned by them respectively at a valuation equal to a market value of $250 a share, less a large deduction therefrom by reason of the company's said investments in real estate; that the amount per share sought to be collected from the defendant in this action, as a tax upon

State *v.* Travelers Ins. Co.

the stock owned by said non-resident shareholders, was far in excess of the amount per share paid and required to be paid as a tax by the several resident shareholders on the stock owned by them.

The demurrer to the answer claimed that the facts alleged therein could not affect the legality of the tax sought to be collected from the defendant in this action, nor the right of the plaintiff to recover, as claimed in the complaint, and specified such claims as follows : —

It is immaterial : (1) that the defendant had, as stated, investments in real estate upon which it was assessed and paid taxes ; (2) at what amount the defendant's investments in real estate were, on October 1st, 1898, carried on its books ; (3) that resident owners of the defendant's stock were, on October 1st, 1898, assessed on their stock at a valuation equal to its market value, less a deduction therefrom by reason of the defendant's investments in real estate ; (4) what amount per share happened to be paid or to be required to be paid as taxes by the different resident shareholders of the defendant, on stock owned by them on October 1st, 1898, in the various counties, towns, cities, boroughs and school districts in which they respectively resided ; (5) that assessors of towns within which resident shareholders reside have happened to assess their stock at a less value than $250 per share, because the valuation of the defendant's stock, as well as the stock of other corporations affected by the same laws, when owned by resident shareholders, is by the laws of this State made by the assessors of the towns within which such shareholders reside ; (6) what taxes were required to be paid by said resident shareholders on the stock owned by them on October 1st, 1898, to counties, towns, cities, boroughs or school districts, in which they severally resided, because the taxes required to be paid by resident shareholders of the defendant corporation, as well as of other corporations affected by the same laws, depend upon the action of the counties, towns, cities, boroughs and school districts in which such shareholders respectively reside.

Other grounds of demurrer were that "it does not appear but that on October 1st, 1898, the defendant company had assets vastly in excess of its capital and surplus, and it does not appear that any part of its capital was then invested in real estate.

"The laws of this State do not provide for any deduction from the market value of the stock of the defendant company owned by resident shareholders, in assessing said stock for taxation, by reason of the investments of said company in real estate."

The trial court having sustained this demurrer, the defendant refused to plead over, and thereupon judgment was rendered for the plaintiff.

The appeal assigns error in holding the statute law,* under which the tax was imposed, to be constitutional; and in not holding that law to be in violation of § 2 of Art. 4, and of the Fourteenth Amendment, of the Constitution of the United States.

*Lucius F. Robinson* and *William R. Matson*, with whom was *John T. Robinson*, for the appellant (defendant).

---

*Section 3836, as amended by Chaps. 63 and 248 of the Public Acts of 1889. "Shares of the capital stock of any bank, national banking association, trust, insurance, investment, turnpike, bridge or plank road company, owned by any resident in this State, shall be set in his list, at its market value in the town in which he may reside; but so much of the capital of any such company as may be invested in real estate, on which it is assessed and pays a tax, shall be deducted from the market value of its stock, in its returns to the assessors."

Section 3916, as amended by Chap. 153, § 2, of the Public Acts of 1897. "The cashier or secretary of each corporation whose stock is liable to taxation, and not otherwise taxed by the provisions of this title, shall, on the first day of October, annually, or within ten days thereafter, deliver to the comptroller a sworn list of all its stockholders residing without this State on said day, and the number and market value of the shares of stock therein then belonging to each; and shall on or before the twentieth day of October, annually, pay to the State one and one-half per centum of such value; and if any such cashier or secretary shall neglect to comply with the provisions of this section he shall forfeit to the State one hundred dollars, in addition to said one and one half per centum so required to be paid."

*Charles Phelps*, Attorney-General, and *Edward D. Robbins*, for the appellee (plaintiff).

HAMERSLEY, J.  The defendant claims that the statute law, under which the tax sought to be collected in this action was imposed, violates the Constitution.

For the purpose of ascertaining our fundamental law, the State and National constitutions must be regarded as substantially one ordinance enacted by that body in whom the supreme sovereignty within our limits is vested.

The reasons urged in support of the defendant's claim, if sound, are really a challenge of the validity of methods of taxation that have existed in this community for 250 years. Our taxation has always been based on the power and duty of the General Assembly—being responsible for the performance of such duty not to the courts but to its constituency—to determine, on grounds of public policy, the methods by which a fair and politic distribution of the stress of taxation may be accomplished.

Every line of objection raised by the defendant must invoke for its final support the claim urged in its brief, that the aphorism, " Taxation shall be uniform and equal," is contained in the Constitution and operates as a limitation on the power of taxation which this court is bound to enforce.  The case therefore practically turns on the existence and authority of such a maxim.

The alleged maxim, in order to control our action, must be found either in some express provision or clear implication of the Constitution.  No court can directly set aside an Act of the legislature ; and the power to indirectly invalidate legislation is one which in the nature of things can exist in the judicial department only under a constitution in the American sense, and is limited by the authority from which it is derived ; it is not a power of veto or revision, but purely the judicial power of interpretation.  This judicial power is bottomed on the absolute supremacy of the law.  In the United States the supreme law is the expressed will of that ultimate sovereignty which has been assumed by the people.

All legislation, as well as the action of all departments of government, must conform to the "supreme original will" of the people as expressed in the constitutions which form the "fundamental and paramount law." *Marbury* v. *Madison*, 1 Cranch, 137, 176; *Davidson* v. *Champlin*, 7 Conn. 244, 246; *Opinion of the Judges*, 30 id. 591, 593.

Since the Supreme Court of the United States in the case of *Marbury* v. *Madison* first announced that the judicial department is authorized to declare a legislative Act void, if the rights of parties are affected by a clear conflict between the supreme and subordinate law, that power has been used without question. This is an exercise of the judicial power of interpretation, but an application of that power which was wholly novel. In the interpretation of a settled principle of jurisprudence its meaning as applicable to existing facts may sometimes be made clear by illustrations drawn from universal moral rules that in a way account for all law; and in the interpretation of a statute, historic facts and political and social conditions may sometimes make clear a doubtful meaning; so similar considerations may at times be proper and necessary in finding the very essence of constitutional limitations. *Norwalk Street Ry. Co.'s Appeal*, 69 Conn. 576, 585; *State* v. *Conlon*, 65 id. 478, 489; *In re Application of Clark*, 65 id. 17, 37, *et seq.* Yet the indiscriminate use in the discussion of these questions of arguments drawn from such sources has undoubtedly induced some practical confusion between the judicial application of a broad principle stated, and the judicial enactment of a principle not stated. The distinction however is radical. One is interpretation, the other is usurpation.

We deem it, therefore, immaterial whether or not the apothegm, "Taxation should be equal and uniform," is sound and ought to be incorporated in our Constitution; for whatever our view as to this might be, we should be compelled to hold that unequal taxation by the legislature might be valid, if the sovereign who enacted our fundamental law has seen fit to grant the power of taxation and refused to impose such a limitation on its exercise.

Passing then to the real question, is there in our fundamental law any express provision, or clear implication from provisions therein contained, that "taxation shall be uniform and equal?"

There can be no claim that such a mandate is directly expressed, either in the State or National Constitution. Express provisions of that nature may be found in the local Constitutions of many States, and have proved a source of practical difficulties for legislatures and courts. They are not found in our own, which assumes that experience has taught that the power of taxation cannot safely be cabined within a theory of uniformity and equality. Taxes, to be both uniform and equal, affecting each inhabitant in proportion to his ability to contribute, can only be devised by a government unhampered by the limitations of humanity. With the complications of civilized society, the stress of taxation is not, and cannot be confined to the individual who pays the tax; its ramifications are widespread and hidden. This and other considerations forbid the assertion of any specific theory as essential to just taxation. It is true that it is the interest of every government that the burden of taxation should be distributed fairly and equally, and that it is the duty of the department in which the taxing power may be vested to honestly use its best judgment to secure such result. If this is what is meant by uniformity and equality being of the essence of taxation, the saying is correct, although unfortunately expressed. But the assertion that a violation of the legislative duty of fair and equal taxation under a Constitution like our own, inherently involves a violation of that Constitution by an overstepping of the limits of legislative power, is not true. If a broad expression of the above principle is desirable, it may more properly be stated thus: Justice and equity in the stress of the whole burden is inherent in taxation, and the power of accomplishing that result is vested, with the power of taxation, in the legislature, subject only to restrictions specified in the grant of that power and to the general limitations placed by the Constitution on the exercise of all legislative power. But

it is unwise to limit the principle by the terms of any author-
itative formula.

Is this maxim necessarily implied from any provisions of
our fundamental law? Unless the vague notion of a higher
law is claimed as a constitutional provision, we are pointed
to no provision, nor to any combination of provisions, from
which it is claimed that such a maxim is a necessary impli-
cation. To controvert a claim which rests on no definite
proposition is ordinarily like fighting the air. But fortu-
nately in this case the task of proving a negative is not diffi-
cult. The provisions of our Constitution exclude the possi-
bility of a limitation of legislative power by any implied.
mandate that taxation shall be equal and uniform.

It is impossible to study the development of our law dur-
ing two and a half centuries, without reaching the certain
conclusion that the right of the people to tax themselves
through their representatives in the General Assembly has al-
ways been held in reverence, and is distinctly secured by the
Constitution; that the duty to exercise the power of taxa-
tion wisely and only for the public good is a legislative duty
for the performance of which the General Assembly is re-
sponsible to its constituency; that the power of considering
the conditions of population or property, the theories and
maxims of political economy or moral philosophy which may
affect taxation, and of determining what on the whole is a
wise and fair mode of distributing the burden, is a purely
legislative power, and that the judicial department is by ex-
press provision of the Constitution forbidden to exercise that
power. Such provisions are incompatible with the existence
in our State Constitution of any maxim of uniformity and
equality in taxation, to be defined by the court and employed
in controlling the General Assembly in the performance of its
legislative duties and the exercise of its legislative powers.

In our National Constitution we find provisions even more
pointedly clashing with such a maxim. The power of taxa-
tion is granted to Congress in the broadest terms. There
are two express limitations as to the manner of exercising
that power, and these limitations, without referring to others,

necessarily exclude the application to all taxes of any rule of "uniformity and equality." One applies to "direct taxes" and the other to "duties, imposts and excises." If any mode of taxation can be conceived which does not come within the meaning of this designation of two kinds of taxation, the exercise of that mode is unlimited.

"Direct taxes shall be apportioned among the several States which may be included within this Union," in proportion to the census directed to be taken. By this positive mandate any rule of equality in laying direct taxes is rendered impossible. The citizens of different States, if thus taxed at all, must be taxed unequally. "All duties, imposts and excises, shall be uniform throughout the United States." This mandate is plainly geographical, demanding uniformity of rate in all places, but not uniformity of operation, and practically forbids the effort to secure uniformity of operation in laying indirect taxes. And so by force of specific commands the theory that equality and uniformity are essential to taxation, is ignored. It is unnecessary to dwell upon the reasons for these provisions; they are familiar to all. But the significant fact is the clear declaration of the sovereign will, that in exercising the power of taxation considerations of public policy must dominate. In certain vital matters affecting the relations of different States to each other and to the general government, these considerations of policy are fixed by the sovereign will, but in all other respects they are committed, with the power of taxation, to Congress; and whether fixed by the Constitution or left to Congress, these considerations are the masters, not the servants, of theories of uniformity and equality.

The Federal courts have had occasion to discuss this matter of "equality in taxation" in two classes of cases. One arising in States whose local constitutions contain some express phrase of that kind, and one arising from the construction of the National banking law. In both classes the court is called upon to deal with the purely judicial question of the interpretation of language used, and in the former has been obliged to struggle with the problem of discovering distinctions that

may save the taxing power from serious paralysis. In some instances these discussions have taken a wide range; but in all the considerations entertained are firmly tied to the question before the court, that is, the meaning of language used, in one case in a State Constitution and in the other in an Act of Congress. But quite recently the specific claim that the United States Constitution contains some rule or principle of equality and uniformity of operation in taxation was made before the United States Supreme Court and decided. *Knowlton* v. *Moore*, 178 U. S. 41, decided May 14th, 1900. In the carefully considered opinion delivered by Mr. Justice White, the court, after long deliberation and with a single dissenting vote, holds that the provisions of the Constitution are inconsistent with the existence of a theory of equality in taxation which the judicial department is empowered to define and impose upon the legislative. The case arose under the war revenue Act of June, 1898, imposing a tax on legacies. The Act provided that when by the same will legacies of different values were bequeathed to different persons, strangers in blood to the testator, the tax on one legacy might be 5 per cent of its value, on another $7\frac{1}{2}$ per cent, on another 10 per cent, on another $12\frac{1}{2}$ per cent, and on another 15 per cent. This tax was uniform only in a geographical sense, and its patent and "profound inequality" can be defended as just only on considerations of public policy. The precise claim was that this whole scheme of taxation was grossly unequal, and therefore was not within the taxing power of Congress, as granted and limited by the Constitution. The power of State legislatures whose State constitutions contain some express provisions requiring uniformity and equality in taxation, to impose such unequal taxation, had previously been sustained on the theory of a distinction in the right of property as recognized and protected by the State, between the right to make a transfer of property to take effect before death and one to take effect after death. It is thus stated in *Magoun* v. *Illinois T. & S. Bank*, 170 U. S. 283, 288: "The right to take property by devise or descent is the creature of the law, and not a natural right—a privilege, and

therefore the authority which confers it may impose conditions upon it. From these principles it is deduced that the State may tax the privilege, discriminate between relatives, and between these and strangers, and grant exemptions; and are not precluded from this power by the provisions of the respective State constitutions requiring uniformity and equality of taxation." Therefore the power of legislatures to tax legacies is less trammeled and "disenthralled from limitations which would otherwise apply, if the privilege of regulation did not exist." How far such a distinction, as applicable to the power of taxing, may result from the impracticable nature of such requirements in the State constitutions, is not material; the distinction has no application to the power of Congress. In *Knowlton* v. *Moore* the court holds that the tax in question is one on the transmission and receipt of property by death, which is as common and legitimate a subject of taxation as any other transmission of property, or as property itself, and says (p. 58): "Of course, in considering the power of Congress to impose death duties, we eliminate all thought of a greater privilege to do so than exists as to any other form of taxation, as the right to regulate successions is vested in the States and not in Congress." And so the precise question whether the United States Constitution forbids inequality in any form of taxation, was presented in a mode the most concrete possible, and decided in the negative. Still, the question whether any particular form of taxation is more just and equal than some other, is a question that must be decided; but not by the judicial department. As to this the court says: "In the absence of constitutional limitation, the question whether it is or is not, is legislative and not judicial."

Is it so, then, that the legislature may make any exaction it pleases under the form of a tax? Clearly not. The legislative power in all its manifestations is limited, including that of taxing, which, however, from its inherent nature, approaches more nearly to arbitrary power. If a tax is laid on the exercise of the duty of voting, or if any exaction is put in the form of taxation as a mere sham, and is in effect and

purpose a denial to one of the enjoyment of rights indicated in the Constitution and the enjoyment of which it secures equally to all, or is a seizure of the property of one for the benefit of another, or is an uncompensated confiscation of property, the law authorizing such exaction is in violation of mandates contained in our Constitution, and probably in all American constitutions, and is therefore void. It is neither taxation nor legislation. Such guarantees are not limitations on the power of taxation, but on all power. It is immaterial in these cases whether the exaction, if it could be considered merely as a tax, is wise or foolish, oppressive or just, equal or unequal; the law is not a law, solely because it is forbidden by some command of the supreme law. The meaning and scope of these commands present questions on which the judgments of the judicial department are final; the wisdom or necessity of distributing the burdens of taxation according to rules of equality, present questions on which the acts of the legislative department are conclusive.

We see no escape from the conclusion that our fundamental law, either State or National, contains no provisions either expressed or implied that " taxation must be equal and uniform," and the question seems to be set at rest by the decision in *Knowlton* v. *Moore.*

The claim, however, is urged that the Fourteenth Amendment and § 2 of Art. 4 of the United States Constitution contain certain provisions inferentially inconsistent with the particular taxation now under discussion. In order to deal with that claim it is necessary to keep in mind the precise nature of this taxation.

The main burden of taxation for municipal purposes falls upon inhabitants of towns proportionally to their ability to contribute to public burdens. Their ability to contribute is determined by lists, prepared under authority of each town, setting to each inhabitant certain sums, according to rules, more or less arbitrary, fixed by the legislature. The gross amount of these sums measures the ability of each inhabitant to pay, and taxes are imposed by all municipal corporations authorized to lay taxes, upon the individuals according to

their ability to pay, thus measured. The rule of measurement was formerly largely arbitrary, but as now fixed by the legislature is substantially the present fair market value of property owned, both real and personal. This rule of taxing inhabitants of towns as individuals according to their ability to contribute, measured by legislative rules, was adopted in 1650 and still prevails as to municipal taxation, and to a limited extent as to State taxation. *Yale University* v. *New Haven*, 71 Conn. 316, 330. When in later years local business came to be carried on by corporations rather than individuals or partnerships, a similar rule was applied in taxing such corporations. When banks were first chartered in 1792 a different rule became necessary as to them, which has since been applied to other corporations of similar character whenever chartered. As the burden of municipal taxation fell on towns, and as the inhabitants of a large number of smaller towns were proportionally less able to bear their burden than those of larger towns, the legislature sought to give to these smaller towns, in the preparation of their tax list, the benefit of all property that could be considered as increasing the ability of their inhabitants to pay; and this desire to relieve small towns from a practically unfair share of burden has influenced our whole system of taxing corporations. While banks were located generally in the larger towns, their property was equitably owned by individuals resident in many other towns, and so, instead of taxing the banks directly, the shares of their stock were treated as distinct personal property and were listed to the individual owners in the towns of their residence. Still later, when corporations such as railroads, savings banks and mutual insurance companies came into existence, it was found impracticable to accomplish fair results by taxing them under existing rules, and as to them still another rule was adopted, *i. e.* that of special taxes by which the legislature taxed the corporation directly for the support of the State government, fixing the sum to be paid, first by an arbitrary rate fixed by the legislature, and second by an arbitrary ascertainment of a sum which might be considered as approximating the value of

the property owned. And these two factors, *i. e.* the rate and the sum to which the rate applies, are arbitrarily determined by the legislature, but with the intent in adjusting each to the other, that the result shall be a fair and just tax. It was early found that these two modes, *i. e.* that of taxing shares as the distinct property of the individual owner, and that of special taxes, must be combined in the taxation of banks and similar corporations. Shares of stock owned by non-residents of any town could not be listed as the personal property of an inhabitant of any town; and for a time the corporations, in respect to shares so owned, escaped all taxation... Eventually a special tax was laid upon the corporation in respect to these shares of non-residents. Like other special taxes, the amount of the tax depends on two factors, *i. e.* the rate and the sum on which the rate is laid, arbitrarily fixed by the legislature, having regard to the other in fixing each. As such non-resident shareholders would otherwise substantially escape that contribution to the taxation of the corporation which is forced from the resident shareholder, the law also compels them, proportionally to the number of their shares, to reimburse the corporation for the special tax so paid in respect to their shares.

It follows, that in taxing one class of corporations the law divides the members of the corporation into two classes, one consisting of shareholders whose property rights can be listed for municipal taxation in the towns of their residence, and the other of those whose property rights cannot be so listed; that it recognizes a similar distinction in the corporate property and interests which belong to the members who constitute the corporation; that the corporate property and interest represented by the former class of members is subjected to municipal taxation and exempted from special taxes, and that represented by the latter class is exempted from municipal taxes and subjected to special taxation; that the portion represented by municipal shareholders is taxed under rules governing rate and sums to which the rate applies, including valuations, determined by the necessities of municipal taxation, and that the portion represented by the State share-

holders, is taxed under different rules, determined by the necessities of special taxation; that all taxes thus laid are to be paid by the shareholders proportionally to the number of shares respectively owned by the members in each class, in one case through the form of a tax as on distinct personal property, and in the other through the form of reimbursing the corporation for an expense which properly belongs to the shareholders on account of whom it was incurred.

The precise thing, therefore, claimed as void is: treating the members of one corporation, together with the proportional part of the corporate property pertaining to them as members, as forming two classes, and subjecting one class to municipal taxes only, and the other class to State or special taxes only; and fixing the amount to be contributed for these diverse objects by members of one class, under rules which necessarily differ in form from those applicable to the other. We have seen that such taxation is not void, because it may be regarded as neither uniform nor equal, nor because it may seem to the judges of this court to be unfair and unjust. *Veazie Bank* v. *Fenno*, 8 Wall. 533, 548. The only remaining claim is, that for some other reason it is in violation of the constitutional provisions mentioned.

The Fourteenth Amendment seeks to add the security of national protection to the two guarantees common to the State constitutions, by which life, liberty and property are free from invasion, except under authority of law consistent with the Constitution, and by which any person or class of persons within State jurisdiction is secured against hostile discrimination in providing equal protection under the law in the enjoyment of rights belonging to all. It was not intended to otherwise affect the existing control of States over the civil rights of its citizens. *United States* v. *Cruikshank*, 92 U. S. 542, 554; *Missouri* v. *Lewis*, 101 id. 22, 31; *Bell's Gap R. Co.* v. *Pennsylvania*, 134 id. 232, 237.

The occasion, purpose, scope and effect of the Fourteenth Amendment were authoritatively stated by the United States Supreme Court, speaking through Mr. Justice Miller, shortly after the adoption of the last three amendments. *Slaughter*

*House Cases*, 16 Wall. 36. The underlying thought of the opinion in that case has never been intentionally departed from; and in a very recent case has been deliberately affirmed by the same court in an opinion delivered by Mr. Justice Peckham, reviewing adjudications of the intervening twenty-seven years. *Maxwell* v. *Dow*, 176 U. S. 581, decided February 26th, 1900. The reasoning of these two leading cases excludes the idea that the Fourteenth Amendment placed any new limitations on the power of the people of the States to determine their civil rights by their fundamental law, unless in the hardly thinkable case of a rescission of the guarantees relative to the supremacy of the law of the land, and equality in the enjoyment of constitutional civil rights. If, then, the legislation complained of is invalid, as invading any civil right secured by our Constitution, and thus deprives the defendant's shareholders of property contrary to the law of the land, or is otherwise obnoxious to these guarantees, it may violate the provisions of the Fourteenth Amendment; otherwise it does not.

It would seem idle to claim the invasion of any such right, unless the right to " equal and uniform taxation " is one. Our fundamental law establishes no such right. And so the appeal to the Fourteenth Amendment fails by reason of the primary error of supposing that our Constitution contains such a maxim. The constitutions of other States contain a maxim of that kind, and in these States a legislative Act imposing an unequal tax on any one is not law; and therefore the collection of such tax might be the seizure of property without due process, *i. e.* contrary to the "law of the land;" or the imposition of such a tax on one person or a select number of persons might invade the right to equal protection of this constitutional exemption from such taxation, and so be a violation of the Fourteenth Amendment. That such taxation comes within the purview of this amendment solely by force of an express prohibition of the State fundamental law (unless indeed the legislative Act is not really one of taxation, but in effect and purpose an Act of confiscation, or in other ways a direct assault upon some lim-

itation of the Constitution affecting all legislative power), is illustrated by the cases cited.

Whatever extension may properly be given to the provision which forbids the denial by any State to any person or selected number of persons within its jurisdiction, of equal protection in the enjoyment of those civil rights secured by its fundamental law to all citizens, it cannot cover the establishment by this amendment of a constitutional rule of "equality in taxation." The broad *dictum* of the United States Supreme Court speaking by Mr. Justice Miller, that while State constitutions may contain provisions against unequal taxation, "the Federal Constitution imposes no restraints on the States in that regard" (*Davidson* v. *New Orleans*, 96 U. S. 97, 105), has been fully confirmed by the logic of recent decisions.

Another line of cases culminating in *Maxwell* v. *Dow, supra,* brings into sharp relief the impossibility of inferring from the provisions of the Fourteenth Amendment any maxim of "equality in taxation."

It was claimed that the Fourteenth Amendment imposed upon each State the limitations of power imposed upon the United States by the first eight amendments. This claim had been denied in several decisions, and in *Maxwell* v. *Dow*, it was held that the State of Utah, through its local Constitution, could deny to every one within its jurisdiction the common-law right of trial by jury, and such denial was not obnoxious to the Fourteenth Amendment, which acted on fundamental rights as they existed in each State. The right of trial by jury, until recent years, has been generally regarded as the most essential of those secured by the muniments of English liberty; with other rights protected by the first eight amendments, it forms the body of "privileges and immunities," which our American constitutions have in general placed beyond the reach of legislative power. "Equality in taxation" finds its source as a fundamental maxim in the brilliant speculations of the Encyclopedists, formulated into a declaration of the "Rights of Man," and adopted by the revolutionary assembly of France in 1789. The proposition

that the Fourteenth Amendment gives the national protection to the equal enjoyment of civil rights as established in each State, and should not be extended by inference, is demonstrably sound; and this being so, through what considerations of public policy or by what process of reasoning can an inference be drawn which leaves the right of trial by jury subject to the control of the State sovereignty and places the theory of "equality of taxation" beyond its power; which holds that sovereignty competent to define and alter the hard won civil rights of freemen, as embodied in the Petition of Rights, the Bill of Rights, our local and national declaration of rights, but powerless to reject the theories of doctrinaires, embodied in the "Rights of Man"?

The defendant's claim of a special violation of § 2 of Art. 4 of the United States Constitution, is greatly narrowed by the elimination of its initial error of treating the maxim "taxation must be equal and uniform" as a mandate of our fundamental law. If the defendant were right as to the existence of such a mandate, then exemption from unequal taxation might be considered a civil right or "privilege" secured by our Constitution to every citizen of this State; and a law which deprived citizens of other States of that privilege might be treated as obnoxious to this particular clause. But the claim being untenable, the clause has no application, unless the legislation in question deprives citizens of our sister States of some other privilege, and one to which our citizens by virtue of their citizenship are entitled. The mere fact of discrimination is immaterial. The exercise of the legislative function necessarily involves discrimination. While discrimination in itself may be harmless, it does sometimes serve to mark the character of legislation. Thus a law purporting to be a police regulation may by reason of its discriminations be shown to be a regulation of commerce. So a law purporting to be mere taxation may by the nature of its discrimination be shown to be in fact a deprivation of citizens of other States of some civil right secured to our own.

"The citizens of each State shall be entitled to all privileges and immunities of citizens in the several States." The

State *v.* Travelers Ins. Co.

meaning and effect of this language in substantial particulars is settled. It is confined to the single purpose of preventing an exercise of the independent power left to each State in favor of its own citizens, in respect to their common personal rights as citizens, and against a participation in the same rights by citizens of other States. " Privileges and immunities " are those civil rights belonging to all citizens of the State. *Corfield* v. *Coryell,* 4 Wash. C. C. 371; *Slaughter House Cases, supra; Blake* v. *McClung,* 172 U. S. 239; *Maxwell* v. *Dow, supra; Lemmon* v. *People,* 20 N. Y. 562. They are not special privileges such as any State may grant to portions of its citizens, but those " which are common to " its citizens under its " Constitution and laws by virtue of their citizenship." *Pembina Mining Co.* v. *Pennsylvania,* 125 U. S. 181. The discrimination must be personal (*Shipper* v. *Pennsylvania R. Co.,* 47 Pa. St. 338), and against citizens of another State as natural subjects of that State; and so corporations cannot be citizens within the meaning of the clause. *Ducat* v. *Chicago,* 10 Wall. 410. To render a State law obnoxious to this clause, it is essential: first, that the privilege claimed by the citizen of another State should be a civil right common to the citizens of the enacting State; second, that the privilege claimed should be denied to a natural citizen of another State in his capacity as such citizen. The legislation complained of does not come within either of these requirements. The " privilege " claimed is under our tax legislation, and must be one of the following: The right of all citizens of this State, being members of a State corporation, to be taxed in respect to their interests in the corporation, (1) for the same objects of taxation, or, if taxed for differing objects, (2) by the same modes of taxation, or, if taxed for differing objects and by different modes, (3) by the same rules of valuation, and (4) to a gross amount of taxation which shall be the same for each member in proportion to his interest. Neither our legislation nor our Constitution entitle our citizens to such rights. The distinctions made by our law are within the legislative power of taxation, and their wisdom or folly cannot present a judicial question. It

may be noted in reference to the fourth privilege claimed, that equality in the gross amount of taxation falling upon two classes of shareholders taxed under our law for the differing objects of municipal taxation and State taxation, is impossible, and the different modes of taxation are adopted with a view of roughly obtaining some equality which cannot be so nearly approximated in any other way. It may be further noted that the taxation is not claimed to be oppressive ; indeed, it was urged in argument that the stress of taxation falling on this defendant and its stockholders is far less than that falling on other corporations transacting a similar business. All these claims resolve themselves into the one claim of a fundamental right to the application of a theory of uniformity and equality in taxation.

If the defendant is treated as representing its "non-resident" shareholders, there is no discrimination against them in their capacity as " citizens of other States." The discriminations are between members of our State corporations by reason of their participation in its grant of corporate franchise. In accepting the rights of property inherent in that grant, they voluntarily put themselves for purposes of taxation under our jurisdiction. The State discriminates in the manner of compelling members of a corporation to share the gross amount which the corporation should contribute under all forms of taxation by reason of the property created and accumulated and of the privileges enjoyed through the State's grant of incorporation. The obligation of the members to submit to such discrimination is an incident to their acceptance and enjoyment of the grant. Shares of stock in the hands of the shareholders may be treated for certain purposes, including some forms of taxation, as a property distinct from that of the corporation, but nevertheless the real interest of the shareholder is a corporate interest, and one element of the taxation the State may impose on the corporation. *The Delaware Railroad Tax*, 18 Wall. 206. It may assess the shares and compel the corporation to pay the tax. *National Bank* v. *Com.*, 9 Wall. 353, 363 ; *Tappan* v. *Merchants' Nat. Bank*, 19 id. 490, 500. Chief Justice Waite, speaking for

the court, stated the principle thus: That "in corporations four elements of taxable value are sometimes found: first, franchises; second, capital stock in the hands of the corporation; third, corporate property; and fourth, the shares of capital stock in the hands of individual stockholders." *Tennessee* v. *Whitworth*, 117 U. S. 129, 136; *Farrington* v. *Tennessee*, 95 id. 679, 687. The State may tax one or all these elements and discriminate in the taxation, unless restricted by some special constitutional provision. It is held that where the Constitution forbids unequal taxation, the State may nevertheless discriminate in the taxation of those rights of property growing out of an exercise of its power to regulate the law of succession and wills; *a fortiori* the State may prescribe the terms on which rights of property growing out its grant of special corporate privileges may be enjoyed. In the law complained of, in so far as it taxes a corporation on account of the interest of its non-resident shareholders, the whole force of "non-resident" as used, is to designate such persons as, by reason of their non-residence in some particular town, cannot be listed for municipal taxation. It is the same in purpose and effect as if the law had directed the stock of all shareholders resident in towns having a grand list of less than $5,000,000, to be subjected to municipal taxation in the town where the owner resides, and directed the corporation, on behalf of all non-residents of such towns, to pay a tax to the State of one per cent on that portion of its franchise and property exempted from municipal taxation and represented by the interests of said non-resident shareholders, the amount of that portion to be ascertained in any manner the legislature might deem just. Such a law would not discriminate against citizens of other States in their capacity as such citizens, and just as clearly, under any fair reading of our legislation, the existing statute does not so discriminate.

The distinction between this case and others where this clause of the Constitution has been applied to taxation, is broadly marked. In all others there was an invasion of that right of every one, secured in the State constitution, to freedom of harmless action in respect to person and property,

equal before the law, to that enjoyed by all other citizens under the same conditions and in the same circumstances. The discrimination was not a mere incident of legitimate taxation, but one aimed directly at citizens of other States, calculated and intended to deny or limit as to them a clearly-defined civil right. We believe the right to equality of privilege in all members of a corporation under the grant of corporate franchise is not secured in any Constitution; certainly not in our own. In *Ward* v. *Maryland,* 12 Wall. 418, the right to freedom of occupation was invaded by a discriminating tax against non-resident traders. In *Blake* v. *McClung,* 172 U. S. 239, the same right was invaded by a law preventing creditors, citizens of other States, in sharing equally with those of Tennessee in the distribution of an insolvent estate of a Tennessee citizen. "Certain creditors, solely because of their being citizens of Tennessee, are accorded advantages in the distribution of the assets in question which are denied to other creditors solely because of their being citizens of another State than Tennessee." *Blake* v. *McClung,* 176 U. S. 59, 66, decided January 8th, 1900. The same distinction appears in the State cases cited. In *Sprague* v. *Fletcher,* 69 Vt. 69, the equality of right, as above defined, in the enjoyment of tangible property, was claimed to be invaded. Without stopping to investigate the application, the principle sought to be applied is similar to that in the Federal cases. In *Farmington* v. *Downing,* 67 N. H. 441, there is the further distinction that the New Hampshire Constitution contains a clause forbidding inequality in taxation; and the case involved the interpretation of the enabling Act of Congress. The invalidity of the New Hampshire law in this particular was not fully considered, as the case had to be disposed of on other grounds. *Oliver* v. *Washington Mills,* 11 Allen, 268, turns on the fact that the thing taxed was tangible property situate in Massachusetts. The conclusion of the court that a dividend after declaration and before payment is a "commodity" belonging personally to the shareholder, the same as his money in the hands of any agent, is the foundation of the opinion. It was contended that the

State law was valid, whether it were considered as imposing a tax, or an excise duty. The court held it void from either point of view. If a tax, it violated the Massachusetts Constitution forbidding unequal taxation; if an excise, it was laid solely on citizens of other States, on account of such citizenship, and so denied to them a privilege or civil right secured to its own citizens. We have been referred to no case where a State law has been held void as violating the provision that " citizens of each State shall be entitled to all privileges and immunities of citizens in the several States," unless the " privilege" was a civil right belonging to all citizens of the enacting State; and the law discriminated against citizens of other States in their capacity as such citizens.

But it is urged that ownership in a share of stock is practically of the same nature as ownership of bonds or debts, or even of tangible property; that our tax law practically affects individuals as directly as a tax on their tangible property; that for all practical purposes, in adopting a different mode of ascertaining the tax to be collected for shares of residents and non-residents, the law imposes a larger tax upon citizens of other States than upon our own citizens; and that under the form of corporate taxation the law in reality and intent discriminates against citizens of other States in respect to that individual equality before the law secured to our own citizens. If in fact our law is a mere sham, devised for the sake of screening an actual purpose of excluding citizens of other States from participation in those civil rights secured to our own, then we cannot sustain the law. The light of justice can pass unimpeded through all coverings of form and lay bare any hiding substance of disobedience to paramount law. When occasion demands, the court cannot shrink from its duty in discovering the real purpose of any legislation. On the other hand it is worse than folly to apply the microscope to the tangled web of taxation, seeking some broken threads that may suggest a defective origin.

It is not, however, true, in the sense suggested, that ownership of a share of stock is practically of the same nature as

ownership of tangible property; the latter rests upon a right, universally recognized from earliest times, which is common to all, and secured in its enjoyment by constitutional guarantees; while the former is of comparatively modern origin, dependent for its existence upon a legislative grant of special privileges to a few, subject in this and in most cases to alteration and repeal. It is true of all corporate taxation that it affects individuals directly, whether it is collected from the corporation before the declaration of a dividend, or afterwards from its members; and it may be true that under the latter mode individuals are affected more directly; but this does not alter the fact that in prescribing the mode of taxation in question the State is exercising its power of limiting the conditions on which the grant of corporate franchise may be enjoyed. While under this mode of taxation a heavier burden may fall on some who are citizens of other States than upon some who are citizens of this State—as a heavier burden may fall upon some than upon others of our own citizens, members of the same corporation—yet it does not appear from the record that the effect of the law as a whole is to impose a larger tax upon citizens of other States than upon our own.

We see nothing in this legislation to furnish any justification for the claim that while it is in form only a permissible mode of corporate taxation, it is in purpose and effect a hostile discrimination against citizens of other States in the enjoyment of property rights common to all, unless it be a provision contained in § 3836 of the General Statutes. The provision was first enacted in 1877. For a long period prior to that time the law taxing banks, insurance companies, and other corporations, treated the shares owned by residents of towns as a property distinct from that of the corporation, and directed the assessors to list such shares at the market value thereof on October 1st, to the owners, like all other personal property; and directed the cashier or secretary of every such corporation to make a return to the assessors of each town, informing them of the names of shareholders resident in that town, of the number of shares held by each, and the market

value thereof during the preceding month. The law also laid a special tax in respect to shares owned by non-residents of towns, whose amount was arbitrarily determined, as before explained, by a valuation measured by the market value of the stock on October 1st, and a legislative rate of one per cent, now fixed at 1½ per cent. In 1877 the legislature, in re-enacting the law directing assessors to list the shares of resident shareholders at their market value, added the following *proviso*: "but so much of the capital of any such company as may be invested in real estate, on which it is assessed and pays a tax, the assessed value of such real estate shall be deducted from the market value of its stock, in its return to the assessors." This *proviso* is the provision of § 3836 in question. The plaintiff claims that the provision applies only to the information to be included in the returns of the corporations to the assessors, to aid them in listing the property owned in their town and in fixing the market value thereof on October 1st, and does not otherwise affect the duty of the assessors to list all such stock at its market value. In the case of *Barrett's Appeal, post*, p. 288, the provision is construed as controlling the action of the assessors.

The defendant claims that the provision thus construed is equivalent in meaning to an enactment that " owners of shares of stock in corporations paying taxes on land in which their capital is invested, shall be entitled to a deduction from the amount of their assessment for taxation, of a sum for each share owned equal to the assessed value of the corporation's land divided by the whole number of its shares ; but citizens of other States shall not be entitled to such deduction from the assessment for taxation of shares owned by them." It is unnecessary to consider what might be the effect of the provision, if it expressed this meaning; for such is not its meaning. We have held that the provision thus construed is not a direction to the assessors to make an arbitrary deduction from the amount of the shareholder's list, but is a direction to make a different valuation, so that the statute, in respect to corporations owning taxable real estate, no longer treats the shareholder as owner of a piece of prop-

erty distinct from that of the corporation, but treats him as owning an interest in a proportional part of the capital of the corporation, *i. e.* of the assets representing the amount of the original capital and profits in excess of existing debts; and therefore, in the valuation of this property for municipal taxation, a deduction shall be made of the capital invested in land already taxed in this State and elsewhere, and the sum to be deducted must bear the same relation to the shareholder's interest in the taxable value of the real estate as the market value of his share bears to his interest in the actual value of the assets in excess of existing debts. *Batterson* v. *Hartford*, 50 Conn. 558, 561; *Dennis' Appeal*, 72 id. 369; *Batterson's Appeal*, ibid. 374.

This change as to the valuation of the property and franchise of a corporation owning taxable real estate, for the purposes of municipal taxation, may produce in some instances more inequality, may be uncalled for or unwise (upon such considerations the action of the legislature is conclusive), but it certainly does not transmute the legislation in question from permissible taxation to a denial to citizens of other States of that common right in the use and enjoyment of property secured to our own citizens. The plan of taxation remains the same; after the change in valuation, as before, it is simply a mode of securing to towns, for purposes of municipal taxation, the benefit of that part of the corporate property represented by shares owned by their inhabitants, and subjecting to State taxation that part represented by shares owned by non-residents, and which cannot be thus subjected to municipal taxation. Here is no hidden purpose to attack the rights of citizens of other States,—no evidence that the underlying intention and real substance of the legislation is to hinder citizens of other States in acquiring and holding property. The alleged hindrance is confined to those who buy stock in corporations paying taxes on real estate. Only a small number of the corporations within the scope of the Act own taxable real estate to any appreciable amount. Can it be said that the law regulating the taxation of half a dozen different kinds of corporations is really intended to

State *v.* Travelers Ins. Co.

hinder citizens of other States from owning stock in the small number of these corporations that may from time to time invest in taxable real estate; or that the real substance of the law changes from legitimate taxation to hostile and forbidden discrimination with each change of its investments by a corporation? Clearly the legislature is free from any sinister motive in this legislation. Nor in its practical effect does the law justify the charge. The claim here is that non-resident shareholders pay a larger tax than residents. This in itself means nothing. The plan of taxation includes a tax as to the two classes of corporate property for different purposes, whose amount is to be ascertained in a different manner; it necessarily involves inequality in the contributions of members of the corporation for corporate taxation; inequality in the gross amount falling upon the two classes, and inequality in the several contributions of members of the same class; it necessarily rejects a theory of uniformity. This the legislature may do. The claim now under consideration is, that in doing this the legislature has produced such a gross inequality between the two classes as in purpose and effect constitutes a denial or hindrance to citizens of other States in the enjoyment of property rights common to all, and secured to our own citizens. It is unnecessary to consider whether, or under what circumstances, the limitations imposed by a State in respect to the mutual relations of members of its corporations in the matter of taxation may transform legislation for that purpose into a denial of rights secured to citizens of other States; it is enough for present purposes that a mere inequality in the stress of taxation cannot produce that effect.

But the claim that in this case the inequality operates against non-residents or citizens of other States as a class, is unfounded. While the admissions of the demurrer assume the tax in respect to the defendant for this year to bear more heavily on non-residents than on residents, the general effect of the law is matter of common knowledge. The average rate of taxation for municipal purposes for the 168 towns approximates 15 mills, which is the rate for the special tax

imposed in respect to non-resident shares; but the average rate for municipal taxation in the ten larger towns (representing much more than half the grand list of the State) is about 21 mills. The clear purpose of the legislature in fixing the mode of valuation for the property subject to a single rate for special taxation, and the valuation for the property subject to widely varying rates for municipal taxation, was to approximate a general equality in the burden that should fall on the two classes of property; and it well may be that the rule objected to in respect to the valuation of the interests of resident shareholders in corporations investing in taxable land, still leaves, as a whole, a lighter burden of contribution resting upon non-resident shareholders.

There is no more in this last than in the other claims of the defendant, unless our Constitution requires uniformity and forbids inequality in taxation. Our fundamental law, State and National, contains no such mandate or maxim. Eliminating from the discussion the notion that some theory of uniformity and equality in taxation constitutes a limitation on legislative power, and confers upon the judicial department authority to supervise the legislature in the performance of its legislative duty of fairly and wisely distributing the burden of taxation, it seems to us apparent that our plan of taxing corporate property and franchise, first adopted more than half a century ago, and in force in its present form for some twenty-five years, is constitutional, and is not obnoxious either to § 2 of Art. 4, or to the Fourteenth Amendment of the United States Constitution.

If a change is desirable it may be feasible to preserve to towns the income now derived from taxes on the stock of their resident shareholders, and to collect all forms of corporate taxation from the corporation, thus distributing the burden proportionably among its members. The wisdom of any change must be determined by the legislature.

We have not considered the question whether it is competent for the defendant in this action to make the claims presented on behalf of its non-resident shareholders. In assuming, as the parties have, that such claims are properly

presented, we wish to exclude from any implication of settlement some nice questions that may be involved in the assumption.

There is no error in the judgment of the Superior Court.

In this opinion ANDREWS, C. J., TORRANCE and HALL, Js., concurred; BALDWIN, J., concurred in the result but not in the whole of the opinion.

BALDWIN, J. (concurring in the judgment, but dissenting from part of the opinion of the court). The opinion of the court rests upon three propositions to which I fully assent. These are, that there is nothing in the Constitution of Connecticut, nor in the Fourteenth Amendment to that of the United States, which either expressly or by implication requires that all taxation by this State shall be uniform or equal; that there is no fundamental principle of free government or natural justice that all taxation shall be uniform or equal; and that a citizen of another State who participates as a shareholder in the defendant corporation in the enjoyment of a special franchise, granted by this State, with a reservation of the power of amendment or repeal at pleasure, is not deprived, by the tax laws which are in question in this cause, of any privilege or immunity coming within the meaning of Art. 4, § 2 of the Constitution of the United States.

I dissent from so much of the opinion as asserts that if it were a fundamental principle of free government and natural justice that all taxation shall be uniform and equal, the judicial power would be incompetent to declare a statute which violated that principle to be no law.

The Constitution of Connecticut (Art. 2) declares that "the powers of government shall be divided into three distinct departments, and each of them confided to a separate magistracy, to wit, those which are legislative, to one; those which are executive, to another; and those which are judicial, to another." It then proceeds (Art. 3), to vest "the legislative power of this State" in the General Assembly, and (Art. 5) "the judicial power of the State" in this and

other courts. This language assumes that a free State has a power of government known as legislative and another known as judicial.

The leading men among the framers of our Constitution were familiar with certain limitations of legislative power, described in the institutional works upon English law. That " if a statute be against common right or reason . . . the common law shall controul it and adjudge it void," had been laid down in Bacon's Abridgment (Statute A, 12, 13, 14), repeating the words of Coke in his report of *Bonham's Case* (8 Rep. 118). So in Wood's Institutes (p. 10) it had been stated that "Acts of Parliament that are against common justice and reason . . . shall be judged void." These principles had been acted upon by American courts. In the *Symsbury Case*, in this State, it had been adjudged, in 1784 and again in 1785, that an Act of our General Assembly to confirm a patent of lands which it had granted, but which trenched upon the limits of a prior grant, was, so far as it did thus trench upon them, void, because it took the property of one man and gave it to another. Kirby, 447, 452. We had then no Constitution, unless it were the colonial charter, and that contained no particular provision affecting laws of such a character. In 1792 the Supreme Court of South Carolina had come to a similar determination, under like circumstances. *Bowman* v. *Middleton*, 1 Bay, 250, 252.

This doctrine had not been universally accepted. Blackstone, so far as the powers of the British Parliament were concerned, had thrown the weight of his authority against it. In a cause taken up from this court to the Supreme Court of the United States, and familiar to every Connecticut lawyer in 1818, it had been, twenty years before, the subject of a difference of opinion between the justices of that tribunal.

Mr. Justice Chase had maintained that " the nature and ends of legislative power will limit the exercise of it," adding the remark that "an Act of the legislature (for I cannot call it a law) contrary to the first great principles of the social compact, cannot be considered a rightful exercise of legislative

authority." Mr. Justice Iredell had taken the opposite view. *Calder* v. *Bull*, 3 Dall. (U. S.) 386, 388, 398.

The question was debated before this court shortly after the adoption of our State Constitution, and thoroughly considered, in an opinion by CHIEF JUSTICE HOSMER, which received the unanimous assent of the court. His conclusion was that should the General Assembly pass a statute authorizing a direct and palpable infraction of vested rights, too unjust to admit of vindication, it would be a violation of the social compact and within the control of the judiciary. *Goshen* v. *Stonington*, 4 Conn. 209, 225.

No Connecticut jurist has gone beyond CHIEF JUSTICE DAGGETT in upholding the plenary authority of the General Assembly prior to the adoption of our Constitution, but he, speaking for this court, defined it as " a legislative power capable of making all laws necessary for the good of the people, not forbidden by the Constitution of the United States, nor opposed to the sound maxims of legislation." *Starr* v. *Pease*, 8 Conn. 541, 548.

The power of this court to declare a statue void which clearly abrogated vested rights, because it would " stand opposed to the true spirit of the Constitution," was affirmed, though with cautious reserve, in 1843, in an opinion by CHIEF JUSTICE CHURCH. *Bridgeport* v. *Housatonic R. Co.*, 15 Conn. 475, 497. In 1856 it was discussed by CHIEF JUSTICE STORRS, and the suggestion made that it could not exist when the power exercised was "properly legislative in its character." *State* v. *Wheeler*, 25 Conn. 290, 297, 298. That by the expression "properly legislative in character" was meant within the sphere of proper legislation, as that sphere may be finally determined, in case of controversy, by a consideration of the fundamental principles of civil government and natural justice, seems to me demonstrated by another case reported in the same volume, in which a legislative grant of a corporate monopoly was adjudged void, in these words : "And although we have no direct constitutional provision against a monopoly, yet the whole theory of a free government is opposed to such grants, and it does not require even

State *v.* Travelers Ins. Co.

the aid which may be derived from the Bill of Rights, the first section of which declares ' that no man or set of men, are entitled to exclusive public emoluments, or privileges from the community,' to render them void." *Norwich Gas Light Co.* v. *Norwich City Gas Co.*, 25 Conn. 19, 38.

In 1861 we again deliberately recognized the general doctrine that a statute directly and unjustly impairing vested rights is void, not because of any constitutional provision, but as in violation of " the fundamental principles of the social compact " which, as we then said, through CHIEF JUSTICE BUTLER, " underlie all legislation, irrespective of constitutional restraints." *Welch* v. *Wadsworth*, 30 Conn. 149, 155. The same great judge soon afterwards stated, with his accustomed clearness and precision, the foundation of the judicial power thus to declare, in extreme cases, a statute not to be a legitimate act of legislative power. The question then before us was whether the General Assembly could allow towns to vote bounties to men volunteering for military service in the field. " It must be conceded," he said, speaking for a unanimous court, " that the people, if convened and organized as a whole, and acting upon the fundamental principle that what the majority prescribe shall be law, could be under no restraint except that imposed by the principles of natural justice ; and the General Assembly in the exercise of that conferred legislative power, and irrespective of the bill of rights, are restrained by the same principles and no other. The first question, therefore, may be further narrowed to the inquiry, whether it is contrary to natural justice that *A* and *B* and the rest of the inhabitants of the State, should be taxed for gratuities to *C* and *D*, when *C* and *D* are called upon to render military service to the general government." *Booth* v. *Woodbury*, 32 Conn. 118, 127, 128.

I believe that the doctrine of *Goshen* v. *Stonington*, since so often reaffirmed, is sound, and that the term " legislative power," as it is used in our American constitutions, refers only to what is " legitimate legislation." *Bradley* v. *New York & N. H. R. Co.*, 21 Conn. 294, 305 ; *Wilkinson* v. *Leland*, 2 Pet. 627, 657. This was the view which was finally

State *v.* Travelers Ins. Co.

adopted and acted on by the Supreme Court of the United States in the leading case of *Loan Association* v. *Topeka*, 20. Wall. 655, 662, 663. If such be not the law, then the inadvertent omission in a bill of rights of any of the guaranties against oppression which are usually enumerated, would leave the citizen in that respect subject to the uncontrolled pleasure of the legislature. Our liberties are not, in my judgment, held on so precarious a tenure.

The importance of the point which has been discussed has seemed to me to justify this full statement of the reasons which lead me to dissent from what is said in regard to it in the opinion of the court. So far as I can discern, however, it has no importance in the cause, and has simply become the occasion of an *obiter dictum.* We all agree that the statutes in question are not unfair nor unjust. The counsel for the defendant, in their argument, rested their case on the effect of certain provisions of the Constitution of the United States. In the disposition which has been made of the objections thus raised I fully concur. It seems to me, therefore, that it was quite unnecessary to consider whether, if the statute under examination had been flagrantly subversive of fundamental principles underlying our Constitution and characterizing all free governments, its operation could not have been controlled by that department of the government in which the people have reposed all their judicial power.