******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ZARELLA, J., with whom ESPINOSA, J., joins, dissenting. The majority claims that it is not deciding that the death penalty is per se unconstitutional;[1] nor is it deciding that Public Acts 2012, No. 12-5 (P.A. 12-5), is unconstitutional. Rather, the majority claims that, following the passage of P.A. 12-5, the death penalty is unconstitutional under the Connecticut constitution because it "no longer comports with contemporary standards of decency [in this state] and no longer serves any legitimate penological purpose." The majority thus treats the claim of the defendant, Eduardo Santiago, as a "hybrid" claim, falling somewhere between a per se challenge and a statutory challenge, in order to avoid the tests we long ago adopted to determine whether the death penalty is unconstitutional on per se grounds or whether a particular death penalty statute is unconstitutional on due process grounds. For example, when determining whether the death penalty is per se unconstitutional, we have applied the six-pronged test set forth in *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992). See *State* v. *Ross*, 230 Conn. 183, 249, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995); see also *State* v. *Rizzo*, 303 Conn. 71, 185, 31 A.3d 1094 (2011), cert. denied, U.S. , 133 S. Ct. 133, 184 L. Ed. 2d 64 (2012). In contrast, when determining whether a death penalty statute is unconstitutional, we have applied the due process principles relevant to the resolution of a statutory claim;[2] see *State* v. *Ross*, supra, 253; except when a *Geisler* analysis is required to determine whether the state constitution provides broader protections under our capital sentencing scheme than the federal constitution. See, e.g., *State* v. *Rizzo*, supra, 136; see also *State* v. *Colon*, 272 Conn. 106, 327, 382–83, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005); *State* v. *Ross*, 269 Conn. 213, 257–60, 849 A.2d 648 (2004). The advantage of treating the defendant's claim as a *hybrid* claim, as opposed to a per se claim or a statutory claim, is that the majority frees itself to create a new and different hybrid test to determine the constitutionality of the death penalty. The majority does this by claiming that the question is not whether P.A. 12-5 is unconstitutional but whether the prospective repeal provision in P.A. 12-5 makes the death penalty unconstitutional. In my view, this is a distinction without a difference. The majority nonetheless relies on it to conjure up a new test, a test this court has never previously applied before in any death penalty case.

The majority's new hybrid test is a confusing combination of the six factor test set forth in *Geisler*, a test we routinely have used to determine whether the death penalty is per se unconstitutional, and a legal standard

derived from federal law that the majority incorrectly claims was adopted by this court in *Ross* and applied in *Rizzo*.[3] In applying this new hybrid test, however, the majority pays only lip service to the *Geisler* factors because it focuses on cruel and unusual punishment instead of on capital punishment. It also disregards the sixth *Geisler* factor and does not consider the relative importance of each *Geisler* factor. This is apparently because the majority wishes to avoid weighing repeated references to capital punishment in the text of our state constitution, the historical roots of capital punishment, Connecticut precedent upholding the constitutionality of capital punishment, and precedent from other state and federal jurisdictions against the federal evolving standards of decency standard on which it relies to determine whether capital punishment is constitutional. The only federal case in which the evolving standards of decency standard has been used to determine whether capital punishment is constitutional, however, is *Gregg* v. *Georgia*, 428 U.S. 153, 173, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976) (opinion announcing judgment), and the standard was applied in that case only *after* the court examined the text of the federal constitution, the history of capital punishment, and federal precedent. See id., 176–79 (opinion announcing judgment). The majority thus disregards *Gregg* as well as our own precedent in refusing to weigh and balance all of the *Geisler* factors in the context of capital punishment. Accordingly, because I strongly protest the majority's unorthodox reasoning in this case, I emphatically dissent.[4]

## I

### IMPROPER LEGAL STANDARD

The majority first conducts an abbreviated *Geisler* analysis that focuses on the meaning of cruel and unusual punishment. It then adopts a new legal standard derived from federal law to determine whether the death penalty is cruel and unusual punishment. In the discussion that follows, I explain why I strongly disagree with each step in the majority's analysis.

### A

### The Majority's Application of *Geisler*

The majority's application of the test set forth in *Geisler* is problematic for two reasons. First, this court has applied the *Geisler* test in other capital cases only when a defendant has challenged the facial validity of the death penalty; see, e.g., *State* v. *Rizzo*, supra, 303 Conn. 185; *State* v. *Ross*, supra, 230 Conn. 249; which the defendant in the present case has not done, or when the defendant has challenged our capital sentencing statutes and it has been necessary to assess whether the state constitution affords broader protection under those statutes than the federal constitution; see, e.g., *State* v. *Rizzo*, supra, 136–45; *State* v. *Webb*, 252 Conn.

128, 146–47, 750 A.2d 448, cert. denied, 531 U.S. 835, 121 S. Ct. 93, 148 L. Ed. 2d 53 (2000); *State* v. *Ross*, supra, 230 Conn. 253–54; which the defendant also has not done. The defendant instead challenges the constitutionality of P.A. 12-5. This is clear not only from the defendant's briefs, but from the parties' oral arguments, in which the defendant's appellate counsel repeatedly described his claim as a statutory claim, and various members of the panel, including Justice Palmer, asked numerous questions regarding the issue of severability if this court should deem the retention provision of P.A. 12-5 unconstitutional.[5] Thus, the majority's decision to review the defendant's challenge to P.A. 12-5 by applying the type of analysis usually reserved for a claim that capital punishment is unconstitutional on per se grounds, even though no such claim has been raised, creates a disturbing anomaly in Connecticut's capital punishment jurisprudence that cannot be lightly dismissed.

Having chosen to apply the incorrect legal standard to review the defendant's claim, the majority then compounds this error by focusing its *Geisler* analysis on the "scope, nature, and history of the protections from cruel and unusual punishment" instead of on capital punishment. As with the majority's initial decision to apply *Geisler*, this is a clear departure from our precedent in capital cases. See *State* v. *Ross*, supra, 230 Conn. 245–48; see also *State* v. *Rizzo*, supra, 303 Conn. 186. The majority acknowledges this deviation, observing that, although this court "used the *Geisler* framework to perform the actual substantive legal analysis" in *Ross* and *Rizzo*, it prefers to follow a different approach in the present case because "the constitutionality of a criminal sanction . . . is governed by its own distinct legal rules and standards," apparently unaware that the "rules and standards" developed for this purpose are *embodied* in *Geisler*. Footnote 14 of the majority opinion. The problem is not simply that the majority rejects well established Connecticut precedent but that the majority's misapplication of *Geisler* fails to achieve the objective for which the test was intended when the court adopted it in *Ross* to review challenges to the validity of capital punishment under the state constitution.

Cruel and unusual punishment is a legal concept intended to describe punishment deemed morally unacceptable by society. See, e.g., *State* v. *Rizzo*, supra, 303 Conn. 188 ("[t]he standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment" [internal quotation marks omitted]); *State* v. *Ross*, supra, 230 Conn. 251 (whether death penalty constitutes cruel and unusual punishment requires court to determine whether it is "so inherently cruel and so lacking in moral and sociological justification that it is . . . fundamentally offensive to evolving standards of human decency"). Thus, when a court is pre-

sented with the issue of whether a particular punishment is cruel and unusual, it must develop a set of principles to guide its analysis. *Ross* was the first case in which this court was asked to decide whether a punishment was cruel and unusual under the state constitution. Consequently, the court in *Ross* was required to develop a principled approach to resolving this question, an approach it rightly expected would be followed in subsequent cases. In so doing, the court first observed that, although the Connecticut constitution contains no cruel and unusual punishment clause, the due process clauses of article first, §§ 8 and 9, of the Connecticut constitution "impliedly prohibit punishment that is cruel and unusual." *State* v. *Ross*, supra, 230 Conn. 246. It then adopted the six factor test articulated in *Geisler* as the most principled means of determining whether capital punishment is cruel and unusual. Id., 249; see also *State* v. *Rizzo*, supra, 184–86. Applying this test, the court examined (1) the text of the constitutional provisions, (2) related Connecticut precedents, (3) persuasive federal precedents, (4) persuasive precedents of other state courts, (5) historical insights into the intent of our constitutional forbearers, and (6) contemporary understandings of applicable economic and sociological norms[6] in order to obtain a proper understanding of whether the people of Connecticut deemed capital punishment morally acceptable. *State* v. *Ross*, supra, 230 Conn. 249.

Instead of conducting a substantive analysis of whether *capital punishment* offends our state constitution under *Geisler*, however, as the court did in *Ross* and *Rizzo*, the majority applies the *Geisler* factors to examine the meaning of *cruel and unusual punishment*. Not unexpectedly, this analysis provides no insights into whether capital punishment is deemed morally acceptable in Connecticut because, with the exception of a small portion of the relevant constitutional history, the majority makes few, if any, references to capital punishment or capital offenses.

The majority also fails to address the sixth *Geisler* factor. The majority explains that, "when construing the state constitutional freedom from cruel and unusual punishment, we broadly adopt the framework that the federal courts have used to evaluate eighth amendment challenges." The majority adds that it will consider the sixth *Geisler* factor—contemporary understandings of applicable economic and sociological norms—only to the extent this factor may be relevant in determining whether capital punishment comports with contemporary standards of decency in Connecticut. It thus becomes clear that the majority's *Geisler* analysis of cruel and unusual punishment is wholly unnecessary to the substantive analysis of capital punishment that follows.

B

The Majority's Application of Federal Law

When the majority finally considers whether capital punishment is constitutional, it substitutes federal eighth amendment jurisprudence in place of the framework adopted in *Ross*. The majority's rationale for creating an independent test derived from federal law, however, makes no legal sense, and its attempt to find support for doing so in *Ross* and *Rizzo* necessarily fails.

The majority relies on *State* v. *Linares*, 232 Conn. 345, 379–87, 655 A.2d 737 (1995), to justify its abandonment of *Geisler*. The majority states that, "[i]n some of our decisions, we have utilized the multifactor *Geisler* analysis to flesh out the general nature and parameters of the state constitutional provision at issue. Having done so, we proceeded to resolve the appellant's particular constitutional challenge according to the legal test and framework relevant and suited to that area of the law, rather than performing the substantive legal analysis under . . . the six *Geisler* factors." Footnote 14 of the majority opinion. The majority explains that the court in *Linares* first conducted a *Geisler* analysis to determine whether the state constitution affords expansive protections to free speech in public places before applying a legal test developed in the free speech context to determine whether the challenged statute infringed impermissibly on those protections. See id. The majority then declares its intention to follow the same approach in the present case because "the constitutionality of a criminal sanction, like the constitutionality of a limitation on the free expression at issue in *Linares*, is governed by its own distinct legal rules and standards." Id.

No meaningful comparison between *Linares* and the present case is possible, however. Among other things, the defendant in *Linares* challenged the constitutionality of a statute, whereas the defendant in the present case, according to the majority, raised a general challenge to the constitutionality of capital punishment following the passage of P.A. 12-5. *Linares* also is inapposite because the purpose of conducting a *Geisler* analysis in that case was "[t]o determine whether our state constitution affords greater rights than the federal constitution"; *State* v. *Linares*, supra, 232 Conn. 379; which the majority repeatedly declares is unnecessary and thus irrelevant in the present case. See footnotes 11 and 17 of the majority opinion. Finally, insofar as a specific legal test has been developed to determine the constitutionality of capital punishment in Connecticut, it is the six factor test set forth in *Geisler*. Thus, to the extent the majority relies on the reasoning in *Linares* to justify its substantive analysis in the present case, its reliance is misplaced.

The majority also claims that this court adopted the federal evolving standards of decency test in *Ross* and

*Rizzo* to evaluate challenges to allegedly cruel and unusual punishment. Nothing could be further from the truth. In both decisions, the court made clear that the standard it was adopting for this purpose was the six factor *Geisler* test; see *State* v. *Ross*, supra, 230 Conn. 249; see also *State* v. *Rizzo*, supra, 303 Conn. 185–86, 188 n.86; which is not a federal standard. To the extent the court in *Rizzo* also discussed contemporary economic and sociological norms, it did so only after accepting the court's analysis of the first five *Geisler* factors in *Ross*. *State* v. *Rizzo*, supra, 185–86. The court explained: "We undertake, in essence, a partial *Geisler* analysis regarding what has occurred since 1994, because our constitutional text and history remain the same, and this court repeatedly has sustained the constitutionality of the death penalty generally and our death penalty statutes in particular. Accordingly, our focus is on recent federal and state jurisprudence and contemporary economic and sociological norms." Id., 188 n.86. The court also noted: "In so doing . . . we remain cognizant that our constitution contains explicit references to capital punishment . . . and, therefore, expressly sustains the constitutional validity of such a penalty in appropriate circumstances." (Citation omitted; internal quotation marks omitted.) Id., 188, quoting *State* v. *Ross*, supra, 230 Conn. 249–50. It is therefore clear that, insofar as *Geisler* permits an evaluation of contemporary norms similar to the federal evolving standards of decency test, it does so only under the sixth *Geisler* factor, subject to the qualifications articulated in *Ross* and to the ultimate weighing and balancing of all six *Geisler* factors. Problems with the majority's analysis under the federal test are further discussed in part II F of this opinion.

On the basis of this review, it is difficult to avoid concluding that the majority's sole intention is to ignore all information, regardless of its historical or contemporary relevance, inconsistent with its predetermined conclusion that capital punishment is unconstitutional in Connecticut. In the discussion that follows, I demonstrate how the majority should have applied *Geisler* in accordance with our precedent and why a proper *Geisler* analysis, even presuming *Geisler* applies, does not support the majority's conclusion that the death penalty is cruel and unusual punishment.[7]

## II

## *GEISLER* ANALYSIS

## A

### Constitutional Text

I begin with the text of the Connecticut constitution. In an analysis that would mystify anyone intent on understanding whether the constitutional text sustains the validity of capital punishment in Connecticut, the majority completely ignores language in the state con-

stitution referring to capital punishment. The majority instead indulges in a meandering, speculative and entirely irrelevant examination of why no cruel and unusual punishment clause was included in the 1818 constitution. As the majority well knows, however, that is not what is expected or required under *Geisler*.

In explaining the textual approach to construing the contours of our state constitution, *Geisler* instructs that, "[u]nless there is some clear reason for not doing so, *effect must be given to every part of and each word in the constitution.*" (Emphasis added; internal quotation marks omitted.) *State* v. *Geisler*, supra, 222 Conn. 685; see also *State* v. *Lamme*, 216 Conn. 172, 177, 579 A.2d 484 (1990) ("[i]n examining the text of [the state constitution] to determine the extent to which it supports the defendant's claim, we must assume that infinite care was employed to couch in scrupulously fitting language a proposal aimed at establishing or changing the organic law of the state" [internal quotation marks omitted]). Consequently, a textual analysis under *Geisler* necessarily requires that the court acknowledge all references in the Connecticut constitution to capital punishment and capital offenses, as this court has done each time it has conducted a textual analysis in the past.

In the present case, even a cursory examination of the text reveals that the Connecticut constitution contains repeated references to capital punishment and capital offenses. Article first, § 8, of the constitution of Connecticut, as amended by article seventeen of the amendments, provides in relevant part: "In all criminal prosecutions, the accused shall have a right to . . . be released on bail upon sufficient security, *except in capital offenses*, where the proof is evident or the presumption great . . . ." (Emphasis added.) Article first, § 8, further provides: "*No person shall . . . be deprived of life*, liberty or property *without due process of law*," and "[n]o person shall be held to answer for any crime, *punishable by death* or life imprisonment, unless upon probable cause shown at a hearing in accordance with procedures prescribed by law . . . ." (Emphasis added.) Finally, article first, § 19, of the Connecticut constitution, as amended by article four of the amendments, provides in relevant part: "[N]o person shall, *for a capital offense*, be tried by a jury of less than twelve jurors without his consent. . . ." (Emphasis added.) Thus, multiple references to capital punishment in the state constitution support the conclusion that, from a textual standpoint, the death penalty does not fall within the implied prohibition of cruel and unusual punishment because it was contemplated not only in 1818, when the relevant language in article first, § 8, was adopted as part of the original constitution; see Conn. Const. (1818), art. I, § 9; but also in 1972, when the provision referring to capital punishment in article first, § 19, was added by article four of the amendments. This court reached the same conclusion

when it conducted a *Geisler* analysis of the Connecticut constitution in *Ross* and *Rizzo*. See *State* v. *Ross*, supra, 230 Conn. 249–50 ("our state constitution makes repeated textual references to capital offenses and thus expressly sustains the constitutional validity of such a penalty in appropriate circumstances"); see also *State* v. *Rizzo*, supra, 303 Conn. 185 (same).

Article first, § 1, of the Connecticut constitution, which describes the constitution as a social compact,[8] provides additional textual support for the conclusion that capital punishment is deemed morally acceptable in Connecticut. A social compact is an agreement "between the people and the government they create [that] binds the agencies of government to respect the blueprint of government and the rights retained by the people." L. Henkin, "The United States Constitution As Social Compact," in American Philosophical Society, "A More Perfect Union: Essays on the Constitution," 131 Proc. Am. Phil. Society 261, 265 (1987); see also *Moore* v. *Ganim*, 233 Conn. 557, 598, 660 A.2d 742 (1995) ("The social compact theory posits that all individuals are born with certain natural rights and that people, in freely consenting to be governed, enter a social compact with their government by virtue of which they relinquish certain individual liberties in exchange 'for the mutual preservation of their lives, liberties, and estates.' J. Locke, 'Two Treatises of Government,' book II [Hafner Library of Classics Ed. 1961] ¶ 123, p. 184; see also 1 Z. Swift, A System of the Laws of the State of Connecticut [1795] pp. 12–13."). Accordingly, repeated references to capital punishment and capital offenses throughout the constitution, which never have been challenged or eliminated by constitutional amendment, suggest that the people of Connecticut always have accepted, and continue to accept, capital punishment as an integral part of the social compact for the purpose of maintaining public order, preserving their freedom to live in peace and tranquility, and "perpetuat[ing] the liberties, rights and privileges which they have derived from their ancestors . . . ."[9] Conn. Const., preamble.

B

Historical Insights

With respect to the relevant constitutional history, *Geisler* explains that the "historical approach" includes consideration of "the historical constitutional setting and the debates of the framers . . . ." (Citations omitted; emphasis omitted.) *State* v. *Geisler*, supra, 222 Conn. 685. *Ross* thus examined "historical insights into the intent of our constitutional forbearers"; *State* v. *Ross*, supra, 230 Conn. 249; and observed that "Connecticut's history has included a death penalty statute since 1650, when it was incorporated into Ludlow's Code . . . and such a penalty was considered constitutional at the time of the adoption of the constitution of 1818." (Citation omitted; footnote omitted.) Id., 250. Neverthe-

less, the majority not only fails to acknowledge the historical roots of capital punishment in Connecticut, but diverts the discussion to an expansive and wholly irrelevant analysis of our state's "unique and expansive constitutional and preconstitutional history" relating to the freedom from cruel and unusual punishment. This is the same approach the majority employs in its analysis of the relevant constitutional provisions by dismissing language in the state constitution referring to capital punishment and capital offenses.

If the majority had conducted the historical analysis required under *Geisler* and conducted in *Ross*, the only conclusion it could have drawn is that capital punishment has deep roots in Connecticut going back to early colonial times and that the framers of the Connecticut constitution in 1818 and the convention delegates in 1965 had no intention of eliminating death as the most severe penalty in a proportional system of punishments.

In practice, the death penalty has been imposed in Connecticut from the founding of the colony in 1636 until the first constitutional convention in 1818. Between 1636 and 1699, when the rationale for the death penalty was embedded in the religious foundation of New England and punishment was regarded as divinely mandated, capital punishment applied at different times to as few as twelve and as many as twenty-three crimes,[10] and thirty-one persons were executed. L. Goodheart, The Solemn Sentence of Death: Capital Punishment in Connecticut (2011), pp. 4, 7, 10–13. Thereafter, during the first seven decades of the eighteenth century, when a more worldly society emerged and the legal culture was transformed to reflect an increasingly secular ethic; id., p. 39; capital punishment applied to between twelve and nineteen crimes,[11] and seventeen persons were executed. Id., pp. 4, 45, 49. Even when the legal system experimented unsuccessfully with reform from 1773 to 1827, capital punishment applied at different times to between six and eleven crimes,[12] and sixteen persons were executed. Id., pp. 4, 75, 79. Thus, when Connecticut held its first constitutional convention in 1818, capital punishment was firmly entrenched and thoroughly accepted as the most severe penalty available to punish criminal offenders.

Public support for capital punishment also was reflected in the views of Zephaniah Swift, who was the chief justice of the Connecticut Supreme Court of Errors from 1815 to 1819, the state's "leading jurist [at the time of the 1818 constitutional convention] and the person most responsible for the major reform of Connecticut's judicial system during" the late eighteenth and early nineteenth centuries. Id., p. 71. Because of Swift's role as "[a] pioneer in the development of an American common law distinct from England"; W. Horton, "Connecticut Constitutional History 1776–1988," 64 Conn. B.J. 355, 358 (1990); his ideas on the

law "take on great significance in determining what the framers had in mind when adopting the language of the constitution." *State* v. *Joyner*, 225 Conn. 450, 490, 625 A.2d 791 (1993) (*Berdon, J.*, dissenting). These ideas are principally understood through his two legal treatises, published in 1796 and 1823,[13] respectively, "setting forth the common law of Connecticut based on the actual practices of local judges." W. Horton, The Connecticut State Constitution (2d Ed. 2012) p. 23. Both treatises are relevant because they describe Swift's views on capital punishment, as well as those of the framers, both before and directly after the 1818 constitutional convention.

In his 1796 treatise, Swift expressed strong support for the death penalty if properly imposed within a proportional system of punishments, explaining that "[i]t is a fundamental principle, that the sole end of punishment is the prevention of crimes, and that every punishment ought to be proportioned to the [offense]." 2 Z. Swift, A System of the Laws of the State of Connecticut (1796) p. 293. He thus approved of the legislature's attempt to create the type of proportional system he advocated by establishing three grades of punishment, these being death, confinement to hard labor and coarse fare, and corporal and pecuniary pains and penalties. Id., p. 296. He disapproved, however, of the number of crimes the legislature had deemed deserving of the ultimate punishment, which included "treason, murder, rape, the crime against nature, mayhem, and arson, where some life is endangered"; id.; believing instead that "[t]he dreadful punishment of death, ought only to be inflicted [for] those crimes which directly and immediately tend to the destruction of society and the human race, as treason, and murder." Id.

When Swift updated his 1796 treatise in the early 1820s, immediately following the constitutional convention, he maintained his belief that punishments should be proportional to the offense and continued to support the death penalty,[14] contending that it should apply not only to treason and murder, but to other crimes as well.[15] 2 Z. Swift, A Digest of the Laws of the State of Connecticut (1823) p. 262. He wrote: "Treason, murder, rape, and arson, where life is destroyed or endangered, ought to be punished with death. These crimes are of such an atrocious nature, that the interest of the community requires they should not only be punished in the severest manner, but the offender ought to be deprived of the power of repeating the crime. The punishment of death will not only be sanctioned by public opinion, but there is no probability that executions will be so frequent in such cases, as to weaken their effect on the community." Id. Accordingly, to the extent the majority suggests that Swift and other reformers rejected harsh punishments and became increasingly uneasy with capital punishment by the time of the constitutional convention, it indulges in revisionist think-

ing.

Approval of capital punishment by our constitutional forbearers is also reflected in their handling of an event that led directly to the calling of the 1818 constitutional convention, namely, legislative interference with a criminal conviction and sentence of death in *Lung's Case*, 1 Conn. 428 (1815). See W. Horton, The Connecticut State Constitution, supra, p. 12. In response to the legislature's action, "Swift convened a special court to try Peter Lung for murder. After being duly convicted and sentenced to die, Lung filed a petition with the General Assembly claiming that the trial had been procedurally improper. The General Assembly agreed, set aside the conviction, and ordered a new trial, at which Lung was promptly convicted, and he was hanged." Id. "The case outraged the Connecticut judges, who were Federalist to a man. Led by Swift, who wrote a pamphlet in 1816 attacking legislative interference with a judicial decision, the judiciary demanded separation of powers." Id., citing Z. Swift, "A Vindication of the Calling of the Special Superior Court, at Middletown, on the 4th Tuesday of August, 1815, For the Trial of Peter Lung, Charged with the Crime of Murder. With Observations on the Constitutional Power of the Legislature to Interfere with the Judiciary in the Administration of Justice" (1816) p. 42 (A Vindication of the Calling of the Special Superior Court).

What is striking about this case, in addition to the fact that it led in part to the 1818 constitutional convention and the adoption of a new state constitution formalizing the separation of powers in Connecticut, is the lack of any suggestion by the legislature or judiciary that the imposition of the death penalty was wrong. Connecticut judges were inflamed because the legislature had interfered with Lung's conviction and verdict due to perceived procedural irregularities, and the fact that he had been condemned to die was simply not an issue.[16]

To the extent the majority disagrees and cites a newspaper article published after Lung's execution "remarking on the 'infrequency of capital punishment' and observing that the '[behavior] of this unfortunate sufferer on this trying occasion, was such as to attract the tenderest sympathy of every rational beholder,' " it misunderstands the context in which the article was written. In his pamphlet on *Lung's Case*, Swift effectively countered any notion that capital punishment lacked broad public support when he observed that public sympathy for a capital offender as the execution drew near was "probably owing to the weakness incident to human nature." A Vindication of the Calling of the Special Superior Court, supra, p. 11. Swift further explained: "When a crime has been committed, public indignation is awakened, and all unite to bring about the conviction of the offender. But as soon as he is

convicted, especially in capital cases—when the awful sentence of death is pronounced, then a sentiment of compassion begins to operate in [favor] of the unfortunate convict: the sense of justice is drowned in the feelings of compassion; and *false* humanity begins to run riot. His case will then be viewed in the most favorable light. Some will doubt about the evidence of his guilt—some will question the propriety of capital punishments in any case, and some will hint at the possible unfairness of the trial. Prejudice will be excited even against the triers, who are then considered as having sought the blood of a fellow creature, and many will find fault with [everything] that has been done from a secret aversion to the law, and a natural disposition to pull down courts, and prostrate government. Artful and designing men well know how to fan the flame and profit by it. Such was the course of things in the case of Lung. As soon as he was removed from the theatre of his crimes, and the place of trial, the convicted murderer was transformed into an innocent sufferer, and many began to take a deep interest in his fate." (Emphasis added.) Id., pp. 11–12.

Whatever public sympathy may have been extended to Lung following his conviction, there is no indication in the annotated debates of the constitutional convention, two years after the uproar over *Lung's Case*, of decreasing public support for capital punishment. See generally W. Horton, "Annotated Debates of the 1818 Constitutional Convention," 65 Conn. B.J. SI-7 through SI-84 (1991). Nor is there evidence that any convention delegates sought to ban capital punishment or objected to the inclusion of language in the constitution referring to capital punishment. See id. The convention appointed a committee of twenty-four delegates to draft the new constitution. See id., SI-14 through SI-15. The committee's proposed language in article first referring to capital offenses and to the deprivation of life without due process of law was based on language in the 1817 Mississippi Bill of Rights; see id., SI-102 through SI-103; and was adopted by the convention delegates without comment. See id., SI-31 through SI-32. Thereafter, language in article first referring to punishment by death that was proposed on the convention floor also was accepted without significant comment or debate. See id.

Directly following the constitutional convention, public support for capital punishment continued unabated when the legislature endorsed the proportional system of punishment advocated by Swift, including the continued use of the death penalty, in revisions to the General Statutes for the purpose of ensuring their conformance with the new constitution.[17] See *State* v. *Ellis*, 197 Conn. 436, 450–51 n.13, 497 A.2d 974 (1985). A note in the crimes and punishments section of the revised statutes explained that "the object has been . . . to proportion the punishment according to the nature and grade of the crime" and that "[t]he experience of this state has

[shown], not only that mild punishments are better calculated to prevent crimes, than those which are sanguinary; but that punishments must be attended with considerable severity, to operate as examples to others . . . ." General Statutes (1821 Rev.) tit. 22, § 118, p. 177 n.5. To that effect, capital punishment, which had been imposed in 1805 for crimes such as bestiality, sodomy, false witness, arson resulting in death, treason, destruction of military property, dismemberment, murder and rape; see Acts and Laws of the State of Connecticut in America (1805), pp. 182, 321, 349, 419; was retained for, among other crimes, treason, murder, maiming, arson and rape. See General Statutes (1821 Rev.) tit. 22, §§ 1, 3, 6, 8, 10, pp. 151–52. The revised statutes also authorized the governor to reward persons who provided authorities with information leading to the timely capture of capital offenders. General Statutes (1821 Rev.) tit. 22, § 118, p. 176.

Almost 150 years later, Connecticut revisited its commitment to capital punishment when an amendment proposing abolition of the death penalty was submitted but soundly defeated at the 1965 constitutional convention, which adopted the state's present constitution. The record of the 1965 proceedings reveals that a Greenwich delegate submitted a resolution entitled "Resolution Proposing an Amendment to the Constitution Concerning Capital Punishment" for the purpose of abolishing the death penalty. Constitutional Convention Record Index, Constitutional Convention of 1965 (August, 1965) p. 5. The resolution received an unfavorable report by the committee on resolutions, however, and was summarily rejected by the convention delegates. Journal of the Constitutional Convention of Connecticut 1965, p. 111. This explicit rejection of a direct attempt to abolish capital punishment in 1965 demonstrates, first, that the death penalty, which had been operative in this state since colonial times, always had been deemed constitutional and, second, that the convention delegates in 1965, like the framers in 1818, did not want to change the status quo. The state's commitment to capital punishment was renewed a second time on December 22, 1972, when article first, § 19, of the Connecticut constitution was amended to provide that "no person shall, *for a capital offense*, be tried by a jury of less than twelve jurors without his consent." (Emphasis added.) Conn. Const., amend. IV. There appears to have been no other attempt to amend the constitution for the purpose of abolishing capital punishment during the last 200 years.

To conclude, any suggestion that there was little or diminishing support for the death penalty before, during or directly after the constitutional conventions of 1818 and 1965 is a gross mischaracterization of the historical record. An examination of Connecticut's history reveals that, although the number of crimes to which capital punishment was applied diminished over the years, the

punishment was accepted in Connecticut as the most severe penalty for a criminal offense not only in 1818, at the time of the first constitutional convention, but in 1972, as well, when the most recent constitutional amendment referring to capital offenses was adopted. Accordingly, a historical analysis under *Geisler* supports the conclusion that capital punishment was not deemed morally unacceptable by our constitutional forbearers.

## C

### Related Connecticut Precedents

A *Geisler* analysis also includes an examination of the "holdings and dicta of this court, and the Appellate Court . . . ." (Citations omitted; emphasis omitted.) *State* v. *Geisler*, supra, 222 Conn. 685. The majority nonetheless continues to disregard *Geisler* by failing to acknowledge this court's recent holdings rejecting challenges to capital punishment under the state constitution. Rather, the majority engages in a brief discussion regarding the degree of protection from cruel and unusual punishment provided under the due process clauses of the state constitution. In addition to fundamentally changing the required analysis, the consequence of this attempt to avoid revealing Connecticut's well established precedent upholding capital punishment is the majority's misrepresentation of the reasoning in *Ross* and *Rizzo*, neither of which adopted a federal evolving standards of decency test to evaluate challenges to allegedly cruel and unusual punishment, as the majority claims. See part I B of this opinion.

When the court considered a constitutional challenge to capital punishment in *Ross*, it relied on *State* v. *Davis*, 158 Conn. 341, 358, 260 A.2d 587 (1969), vacated on other grounds, 408 U.S. 935, 92 S. Ct. 2856, 33 L. Ed. 2d 750 (1972), in concluding that "Connecticut case law has recognized the facial constitutionality of the death penalty under the eighth and fourteenth amendments to the federal constitution." *State* v. *Ross*, supra, 230 Conn. 250. Since *Ross*, capital punishment has been deemed facially constitutional in many other cases as well. See *State* v. *Santiago*, 305 Conn. 101, 307, 49 A.3d 566 (2012); *State* v. *Rizzo*, supra, 303 Conn. 184, 201; *State* v. *Colon*, supra, 272 Conn. 383; *State* v. *Reynolds*, 264 Conn. 1, 236–37, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004); *State* v. *Cobb*, 251 Conn. 285, 496–97, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000); *State* v. *Webb*, 238 Conn. 389, 401–402, 411–12, 680 A.2d 147 (1996); *State* v. *Breton*, 235 Conn. 206, 218, 663 A.2d 1026 (1995).

This court also has implicitly endorsed the constitutionality of capital punishment under the social compact clause of the state constitution. In *Webb*, the court determined that the social compact clause does not

preclude death penalty legislation in Connecticut because Connecticut's social compact does not confer on convicted offenders a natural and unenumerated right to life. *State* v. *Webb*, supra, 238 Conn. 411–12. The court explained: "Unenumerated rights [such as a citizen's right to be protected from capital punishment] exist, if at all . . . only if they are grounded in or derived from the constitutional text or Connecticut's unique historical record"; id., 410; and "the constitutional text and historical record support the constitutionality of the death penalty statutes [in Connecticut]." Id., 411 n.21. Accordingly, relevant Connecticut precedent overwhelmingly supports the conclusion that capital punishment has continued to receive strong public support in Connecticut in recent years.

## D

### Persuasive Federal Precedents

*Geisler* further instructs the court to consider "federal constitutional precedents that appropriately illuminate open textured provisions in our own organic document . . . ." (Internal quotation marks omitted.) *State* v. *Geisler*, supra, 222 Conn. 685. Although none of the provisions in the Connecticut constitution referring to capital punishment is open textured, the court in *Ross* cited to *Gregg* v. *Georgia*, supra, 428 U.S. 153, for the proposition that federal constitutional law does not forbid the death penalty outright and that federal constitutional law is consistent with the repeated recognition of capital punishment in our own constitution. *State* v. *Ross*, supra, 230 Conn. 250. Nonetheless, the majority disregards federal precedent holding that capital punishment is constitutional and directs its attention to the "minimum standards for what constitutes impermissibly cruel and unusual punishment" under the federal constitution. Text accompanying footnote 15 of the majority opinion.

The majority claims that the United States Supreme Court has identified as unconstitutionally cruel those punishments that are (1) inherently barbaric, (2) excessive and disproportionate, and (3) arbitrary or discriminatory, and contends that the court in *Ross* "broadly adopted, as a matter of state constitutional law, this federal framework for evaluating challenges to allegedly cruel and unusual punishments." Text accompanying footnote 17 of the majority opinion. This is not the case. There is no reference in *Ross* to this federal framework as the basis for evaluating the constitutionality of capital punishment. The only references in *Ross* to capital punishment as being excessive or arbitrarily imposed are in the context of as applied challenges to the constitutionality of Connecticut's death penalty statutes. See *State* v. *Ross*, supra, 230 Conn. 231, 232, 239. As for the barbarity of capital punishment, the author of the dissenting opinion in *Ross* was the only member of the court to use that term. Id., 298 (*Berdon*,

*J.*, dissenting in part). Furthermore, as repeatedly noted in this opinion, the court in *Ross* adopted the framework established in *Geisler* to evaluate challenges to allegedly cruel and unusual punishments. Accordingly, because the United States Supreme Court has not modified or rejected its conclusion in *Gregg* that capital punishment is not forbidden in all circumstances under federal constitutional law, federal precedent continues to support the constitutional validity of capital punishment under the Connecticut constitution.

E

Persuasive Precedents of Other State Courts

*Geisler* next requires an examination of "sister state decisions . . . ." (Citations omitted; emphasis omitted.) *State* v. *Geisler*, supra, 222 Conn. 685. In *Ross*, the court followed this directive by observing that "[c]ourts in the overwhelming majority of our sister states have rejected facial challenges to the death penalty under their state constitutions." *State* v. *Ross*, supra, 230 Conn. 250. The court specifically noted that, between 1972 and 1994, thirty-seven states had passed death penalty statutes, and, in the only two jurisdictions in which the state's highest court had deemed the death penalty facially unconstitutional, California and Massachusetts, subsequent constitutional amendments promptly abrogated those decisions. Id., 250 n.30. Although the majority does not address this question as part of its *Geisler* analysis but, rather, as part of its subsequent discussion of evolving standards of decency, I note for the record the majority's concession that "capital punishment remains legal in a majority of jurisdictions within the United States . . . ." An analysis of persuasive state precedents thus supports the continued validity of capital punishment under the Connecticut constitution.

F

Economic and Sociological Considerations

The last *Geisler* factor, economic and sociological considerations, is the most challenging factor to interpret and apply. See *State* v. *Geisler*, supra, 222 Conn. 285. The court in *Geisler* provided little guidance as how to conduct this analysis and merely cited to *State* v. *Dukes*, 209 Conn. 98, 547 A.2d 10 (1988), in which the court observed that "[c]onstitutional provisions must be interpreted within the context of the times"; id., 114; and that the state constitution "should not be interpreted too narrowly or too literally so that it fails to have contemporary effectiveness for all of our citizens." Id., 115. Accordingly, the court in *Ross* determined that this factor requires an examination of "whether contemporary understandings of applicable economic and sociological norms compel the conclusion that any death penalty constitutes cruel and unusual punishment." *State* v. *Ross*, supra, 230 Conn. 251. The court explained: "The question is not whether any one of us would vote

to enact a death penalty if our role were that of a legislator. It is, rather, whether the defendant is correct in his contention that the death penalty is so inherently cruel and so lacking in moral and sociological justification that it is unconstitutional on its face because it is fundamentally offensive to evolving standards of human decency." Id. The court then advised: "Judicial evaluation of evolving standards of human decency cannot proceed in a vacuum. Community standards of acceptable legislative policy choices are necessarily reflected in the text of our constitutional document, in our history and in the teachings of the jurisprudence of our sister states as well as that of the federal courts."[18] Id.

In an apparent attempt to circumvent this analysis, the majority replaces it with an entirely new standard, derived from federal law, that requires a determination as to whether capital punishment comports with evolving standards of decency. Apparently searching for precedent in Connecticut's own capital punishment jurisprudence, the majority suggests that the federal standard pertaining to evolving standards of decency was adopted in *Ross* and followed in *Rizzo*. This is not the case.

The majority initially contends that, when the court in *Ross* and *Rizzo* considered whether the death penalty was cruel and unusual punishment under the state constitution, it did not address the issue as a single constitutional claim but as "two distinct constitutional [claims]," the first being a per se claim that capital punishment violates the state constitution under all circumstances, and the second being a claim that capital punishment no longer comports with Connecticut's evolving standards of decency. The majority thus appears to rely on the existence of this purported second claim in *Ross* and *Rizzo* as precedent for framing the defendant's claim in the present case as a claim that capital punishment is unconstitutional because it no longer comports with evolving standards of decency in Connecticut. Having identified *Ross* and *Rizzo* as precedent for the defendant's claim, the majority next contends that, although the court addressed the evolving standards of decency claim only briefly in *Ross*, it conducted "a more sweeping review" of a similar claim in *Rizzo* before concluding that there remained strong public support for capital punishment in this and other jurisdictions. The majority then adopts "five objective indicia of society's evolving standards of decency," based on federal eighth amendment jurisprudence, to review the defendant's claim. These include (1) the historical development of the punishment at issue, (2) legislative enactments, (3) the current practice of prosecutors and sentencing juries, (4) the laws and practices of other jurisdictions, and (5) the opinions and recommendations of professional associations. See text accompanying footnote 43 of the majority opinion. For the following reasons, I strongly disagree with the

majority's misrepresentation of the reasoning in *Ross* and *Rizzo* for the apparent purpose of legitimizing its adoption of a wholly independent test derived from federal law and of avoiding the analysis required under the sixth *Geisler* factor.

First, in *Ross* and *Rizzo*, the court considered and decided only *one* claim challenging the constitutionality of capital punishment under the state constitution. In both cases, that claim was brought on *per se* grounds. *State* v. *Rizzo*, supra, 303 Conn. 184; *State* v. *Ross*, supra, 230 Conn. 245. There was no second claim in either case challenging the constitutionality of capital punishment on the ground that it failed to comport with evolving standards of decency.

Second, to the extent the court considered evolving standards of decency in *Ross* and *Rizzo*, it did so in the context of the sixth *Geisler* factor, which *Ross* described as requiring an examination of contemporary understandings of applicable economic and sociological norms. See *State* v. *Ross*, supra, 230 Conn. 251; see also *State* v. *Rizzo*, supra, 303 Conn. 186–88. There is no room for debate regarding these facts.

Third, although the court conducted a more expansive analysis in *Rizzo* than it did in *Ross* under the sixth *Geisler* factor, it did not go nearly as far as the majority contends. As previously discussed, *Ross* stated that evidence of contemporary understandings of applicable economic and sociological norms, or evolving standards of human decency, "are necessarily reflected in the text of our constitutional document, in our history and in the teachings of the jurisprudence of our sister states as well as that of the federal courts." *State* v. *Ross*, supra, 230 Conn. 251. Thus, the court in *Rizzo* began its analysis of the sixth *Geisler* factor by noting that the "constitution contains explicit references to capital punishment . . . and, therefore, expressly sustains the constitutional validity of such a penalty in appropriate circumstances." (Citation omitted; internal quotation marks omitted.) *State* v. *Rizzo*, supra, 303 Conn. 188. The court then examined developments in the capital punishment jurisprudence of the United States Supreme Court and our sister states, as instructed by *Ross*. See id., 188–90. In a departure from *Ross*, however, the court in *Rizzo* also considered actual practices in other states and determined that, because several thousand inmates were being held on death row in thirty-six states, the death penalty continued to be accepted in the nation generally. See id., 190–92. All of the remaining discussion in *Rizzo*, which concerned a decline in the number of executions and in new death sentences, the results of public opinion polls, international norms, whether capital punishment continues to serve a legitimate penological purpose, and the passage but subsequent veto of legislation in Connecticut repealing capital punishment, was in

response to arguments by the defendant in that case, and was not initiated by the court or necessary to the court's analysis under the sixth *Geisler* factor. See id., 192–201.

Fourth, the majority concedes that the "five objective indicia of society's evolving standards of decency" are largely derived from eighth amendment jurisprudence rather than Connecticut law. In addition to the fact that this is contrary to the majority's claim that it is deciding this case after "careful consideration of the defendant's claims in light of the governing constitutional principles and *Connecticut's unique historical and legal landscape*"; (emphasis added); the five indicia are drawn from four federal cases, each of which articulated a slightly different set of criteria in determining whether the penalty in question was constitutional. See *Graham* v. *Florida*, 560 U.S. 48, 61–62, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010) (legislative enactments and actual sentencing practices); *Atkins* v. *Virginia*, 536 U.S. 304, 313–16, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002) (legislative enactments); *Thompson* v. *Oklahoma*, 487 U.S. 815, 822–23, 830, 108 S. Ct. 2687, 101 L. Ed. 2d 702 (1988) (legislative enactments, jury determinations, views of respected professional organizations and views of other nations); *Enmund* v. *Florida*, 458 U.S. 782, 788–89, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982) (historical development of punishment, legislative enactments, international opinion, and sentencing decisions of juries). Moreover, a comparison of the majority's five indicia with those discussed in *Ross* shows that only two of the five overlap. These two common indicia are the history of the punishment in question and the laws and practices of other jurisdictions. The other three indicia, legislative enactments, the current practices of prosecutors and sentencing juries, and the opinions and recommendations of professional associations were not recognized in *Ross*. Correspondingly, the majority does not recognize the first and most important indicium recognized in *Ross*, the constitutional text, as one of the five indicia in its analysis. This discrepancy between the five indicia that the majority adopts in the present case and the indicia described in *Ross* is significant.

As previously discussed, *Ross* advised that "[j]udicial evaluation of evolving standards of human decency cannot proceed in a vacuum. Community standards of acceptable legislative policy choices are necessarily reflected in the text of our constitutional document, in our history and in the teachings of the jurisprudence of our sister states as well as that of the federal courts." *State* v. *Ross*, supra, 230 Conn. 251. *Ross* thus viewed evolving standards of human decency in the broadest possible sense. Given this understanding, the current practices of prosecutors and sentencing juries, and the opinions and recommendations of professional associations, are not particularly relevant because they are not representative of the community as a whole.[19] In

contrast, because the state constitution is a social compact that incorporates the principles by which an entire society is governed, it is far more likely to reflect the views of the general population. In Connecticut, for example, the state constitution was amended fifty-nine times between 1818 and 1965, and thirty-one times since 1965; W. Horton, The Connecticut State Constitution, supra, pp. 17, 22; and thus reflects not only the beliefs of the original framers but those of the people of Connecticut over the course of 200 years. Historical information, including events of more recent origin, likewise provides a broad view of social change within the state and is not unduly reflective of a single perspective. As for the jurisprudence of other jurisdictions, the court in *Ross* understood that Connecticut is not a self-contained entity that exists in a vacuum but is inextricably linked to other federal and state jurisdictions. Accordingly, the capital punishment jurisprudence of other jurisdictions may be influenced to some degree by the same events and historical developments that inform our own. I therefore do not take issue with the majority's reliance on the historical development of the punishment at issue or on the laws and practices of other jurisdictions, although I strongly disagree with the majority's analysis and conclusions.

I also disagree with the majority's reliance on legislative enactments as one of the five indicia of evolving standards of decency and with its specific reliance on the passage of P.A. 12-5 as the principal basis for determining that capital punishment is impermissible under the Connecticut constitution. The majority concedes at the outset that this is the most important part of its analysis, stating that, "[u]pon careful consideration of the defendant's claims in light of the governing constitutional principles and Connecticut's unique historical and legal landscape, we are persuaded that, following its prospective abolition, this state's death penalty no longer comports with contemporary standards of decency and no longer serves any legitimate penological purpose." In my view, this is a serious mistake, not only because it is inconsistent with Connecticut precedent but because it places the legislature in a legally untenable position.

I note initially that the court in *Ross* did not contemplate judicial reliance on state legislation as a basis for determining evolving standards of decency in the context of a state constitutional claim. Rather, the court deliberately steered clear of this potential quagmire and made no reference to legislative enactments as one of the indicia of community standards in Connecticut, most likely because of the legal predicament that would have resulted from relying on legislative enactments to deem a criminal penalty unconstitutional.

The majority seems to believe that relying on legislation to determine evolving standards of decency is

appropriate in a state constitutional analysis because the court in *Rizzo* quoted language by the United States Supreme Court declaring that "the clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures . . . ." (Internal quotation marks omitted.) *State* v. *Rizzo*, supra, 303 Conn. 191, quoting *Atkins* v. *Virginia*, supra, 536 U.S. 312. The majority, however, takes this language out of context. In *Rizzo*, the court did *not* recognize legislative enactments in Connecticut as a source of community standards in this state but cited *Atkins* in discussing recent developments in our sister states, which *Ross* had recognized as relevant under the sixth *Geisler* factor. See *State* v. *Rizzo*, supra, 191–93; *State* v. *Ross*, supra, 230 Conn. 251.

The majority also fails to understand the difference between examining legislative enactments in a federal and a state constitutional analysis, and why it is appropriate in the former but makes no sense in the latter. The answer, however, is simple. In a federal analysis of a death penalty statute, the statute is compared to all of the *other* state statutory schemes in order to determine whether the statute under review is out of step with contemporary norms. When analyzing the constitutionality of the death penalty under the state constitution, however, the majority reviews the state statute by comparing it against itself. This makes no sense. Thus, if P.A. 12-5 authorized drawing and quartering for those convicted of murder, the majority would conclude that the standards of decency in Connecticut are established by the public act and are therefore constitutional. This logical incoherence is why the court in *Ross* did not rely on legislative enactments to determine contemporary norms.

In my view, if the legislature decides to eliminate capital punishment, it is because it is authorized to do so under the state constitution; see *State* v. *Darden*, 171 Conn. 677, 679–80, 372 A.2d 99 (1976); and its decision has no implications regarding the constitutionality of the punishment itself. If, on the other hand, the legislature establishes capital punishment as the most severe penalty in a proportional system of punishments, it is because the Connecticut constitution expressly recognizes death as a viable penalty. Thus, the only way capital punishment may be deemed unconstitutional in Connecticut is by the approval of a constitutional amendment to that effect. Capital punishment also may be eliminated by legislative repeal of the death penalty in its entirety, but a legislative act eliminating capital punishment is not an indication that the punishment is unconstitutional. If social values have changed such that capital punishment no longer comports with contemporary standards of decency in Connecticut, this will be reflected in legislative action or a constitutional amendment banning capital punishment. In the absence of a constitutional amendment, neither an act of the

legislature nor a judicial edict can nullify explicit constitutional provisions expressly recognizing capital punishment or erase from the historical record the relatively recent rejection of a proposed abolition amendment during the 1965 constitutional convention. Accordingly, P.A. 12-5 cannot serve as the basis for concluding that capital punishment is unconstitutional in Connecticut under the federal test the majority adopts or, for that matter, under any other test. The only realistic constitutional claim that can be made regarding the effect of P.A. 12-5 on the defendant's sentence is that the statute is unconstitutional.

Rejecting the standard the majority adopts, and applying the standard on which the court in *Ross* relied, I believe contemporary understandings of applicable economic and sociological norms do not compel the conclusion that capital punishment is morally unacceptable in Connecticut. As previously discussed, the state constitutional text contains numerous references to capital punishment. See part II A of this opinion. Thus, I agree with Justice Scalia that "[i]t is impossible to hold unconstitutional that which the [c]onstitution explicitly *contemplates*." (Emphasis in original.) *Glossip* v. *Gross*, U.S. , 135 S. Ct. 2726, 2747, 192 L. Ed. 2d 761 (2015) (Scalia, J., concurring). This is especially true in Connecticut, where there have been more than eighty-five amendments to the state constitution since 1818 and the delegates to the 1965 constitutional convention rejected an amendment abolishing capital punishment. The Connecticut constitution thus reflects current public attitudes toward capital punishment, as well as those of the original framers. At this time, state and federal jurisprudence also supports the conclusion that capital punishment is morally acceptable under the state constitution. See part II D and E of this opinion. As for Connecticut's history, I disagree with the majority's claim that "new insights into the history of capital punishment in Connecticut, in tandem with the legislature's 2012 decision to abolish the death penalty prospectively . . . [provide] a clear picture of the long, steady devolution of capital punishment in our state . . . ."

The majority claims that various developments during the past 400 years "have resulted in capital punishment being available for far fewer crimes and criminals, and being imposed far less frequently, with a concomitant deterioration in public acceptance." As Chief Justice Rogers discusses in her dissenting opinion, however, the historical record does not demonstrate a decline in public support for the death penalty in Connecticut as the most severe form of punishment, even in contemporary society, where persons accused of capital crimes are provided with many more legal protections than similar offenders were provided in the past.

The "new insights" to which the majority refers appear to come entirely from the author of a recently

published book, Lawrence B. Goodheart, who repeatedly demonstrates his bias in favor of abolishing capital punishment in his commentary, in his selection and presentation of the historical evidence, and in numerous other published articles. See, e.g., L. Goodheart, supra, p. 2 (opining that "the death penalty in Connecticut is contradictory in principle and unworkable in practice"); L. Goodheart, "Changing Use of Death Penalty Argues For Abolition," Hartford Courant, April 23, 2011, p. A7 ("[m]y research has convinced me that it's time to abolish a law that is unenforceable, unfair and unethical," and "I've come to the belief that we can no longer enforce this law, it was never effective and it was unfairly applied"); see also M. Kirk, "The History of the Death Penalty in Connecticut," UCONN Today, October 24, 2011, available at http://today.uconn.edu/2011/10/the-history-of-the-death-penalty-in-connecticut/ (last visited July 27, 2015) (quoting from interview in which Goodheart expresses opposition to death penalty). Accordingly, Goodheart does not discuss the historical facts on which he relies in a completely objective fashion. Nevertheless, even Goodheart concedes that public support for capital punishment has remained strong in Connecticut during the past four centuries. For example, he observes that, in the more recent past, "[d]espite a petition campaign and gubernatorial support, opponents [of capital punishment] during an era of reform in the 1840s and 1850s failed to sway the legislature . . . ." L. Goodheart, The Solemn Sentence of Death: Capital Punishment in Connecticut, supra, p. 3. Similarly, "[a]fter the horrors of World War II, Governor Abraham Ribicoff . . . supported broad-based efforts to end capital punishment, but the General Assembly voted down abolition . . . ." Id., pp. 3–4. Thereafter, in 1963, "the House voted overwhelmingly, once again, to retain capital punishment" because of "popular support for the execution of hardened criminals"; id., p. 201; and, "[i]n 1965, the House voted . . . 167 to 67 to retain the death penalty." Id., p. 202. Goodheart also observes that, in the 1970s, following the United States Supreme Court's decision in *Furman* v. *Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), in which, according to Goodheart, the nation's highest court "found that the arbitrary and inconsistent imposition of the death penalty violated the [e]ighth and [f]ourteenth amendments [of the federal constitution] concerning cruel and unusual punishment and due process of the law"; L. Goodheart, The Solemn Sentence of Death: Capital Punishment in Connecticut, supra, p. 196; Connecticut did not abolish capital punishment but "was one of thirty-seven states to rewrite its capital code to comply with the revised standard." Id.

In explaining why the death penalty retains strong public support in Connecticut, Goodheart states that "[s]urveys of public opinion provide an answer. A Quinnipiac University poll in January [of] 2005 indicated

that 59 percent of Connecticut residents favored the death penalty," which was "comparable to national sentiment." Id., p. 249. Goodheart also observes that, more recently, "[p]ublic opinion, the General Assembly (except in 2009), most governors, and the courts (state and federal) sustain the death penalty, at least for particularly cruel and heinous murders." Id., p. 2. He further acknowledges that, "[a]fter nearly four centuries of capital punishment, Connecticut is exceptional in its region in still carrying out the [capital punishment] statute. It appears that a substantial majority of the state's citizens wish to preserve the death penalty, at least for multiple murderers . . . ." Id., p. 5. At other times, he explains that "[t]he death penalty remains on the books because enough citizens believe that it is a necessary and just retribution"; id., pp. 5–6; and that "[m]ost citizens in Connecticut [have] approved the death penalty when it applie[s] to horrific murders." Id., p. 250. For example, Goodheart states that 70 percent of those polled supported the execution of Michael Ross in 2005, the last person executed in Connecticut, and that "[o]ne-fourth of those who had previously indicated they opposed the death penalty wanted Ross executed." Id. Goodheart ultimately concludes, without qualification, that, despite a vocal minority, "[p]ublic opinion supports the death penalty for [the worst] killers . . . ." Id., p. 252. Goodheart's statistics are consistent with statistics cited by Chief Justice Rogers in her dissenting opinion, which indicate that 62 percent of Connecticut voters favored the death penalty in April, 2012, and 59 percent in March, 2013, for persons convicted of murder. See footnote 31 of Chief Justice Rogers' dissenting opinion and accompanying text. Thus the "facts" cited by the majority's own "historian" do not support its claim that there has been a significant "deterioration in public acceptance" of the death penalty.

That capital punishment in Connecticut has been applied to a steadily decreasing number of crimes during the past 400 years and has been carried out infrequently in more recent decades does not mean that capital punishment for the most terrible crimes is lacking in significant public support. There always has been public debate as to the type and number of crimes to which capital punishment should apply, and the protections afforded to offenders before the punishment is carried out have grown over the years, thus extending the time between sentencing and execution. Capital punishment nonetheless continues to receive public support in Connecticut. This was reflected most recently in the inability of the legislature to override former Governor M. Jodi Rell's veto following the passage of an act intended to repeal the death penalty prospectively in 2009; see Public Acts 2009, No. 09-107; in the failure of similar legislation to achieve a full vote in either chamber of the legislature after advancing through the Judiciary Committee in 2011; see *State* v.

*Rizzo*, supra, 303 Conn. 199; and in the fact that P.A. 12-5 provides only for the prospective repeal of capital punishment, while *retaining* it for current death row inmates.

The majority declares that the passage of P.A. 12-5 is a tipping point in the history of capital punishment in Connecticut, in that it represents such a significant change in public mores that capital punishment no longer comports with contemporary standards of decency. The majority's argument, in a nutshell, is that the passage of P.A. 12-5 is an expression of moral outrage against what the majority describes as the barbaric, excessive, arbitrary and discriminatory penalty of death. In reaching this conclusion, however, the majority rejects alternative explanations as to why the legislature may have passed P.A. 12-5, including that the death penalty is too expensive, that it takes too long to be carried out, or that it is merely an exercise of the legislative prerogative to establish penalties for crimes. The majority's narrow-minded view, however, is unsupported by the facts. If the legislature, as the majority claims, had rejected the death penalty only on the ground that it is barbaric, excessive, arbitrary and discriminatory, then why would it have enacted a retention provision specifically allowing executions to go forward for all current death row inmates, and why would it have permitted future arrests, indictments, the commencement of trials, and executions to be carried out with respect to those who had not yet been charged with a capital crime but who had committed such a crime before the effective date of P.A. 12-5? One need not be a legal scholar to understand that the majority's conclusion is not only out of step with the intent of P.A. 12-5, but is disrespectful to a coequal branch of government.

In sum, there is no support for the majority's determination that capital punishment no longer comports with evolving contemporary standards of decency or with understandings of applicable economic and sociological norms under the sixth *Geisler* factor. Nor can any support for its conclusion be drawn from the passage of P.A. 12-5. Accordingly, all six *Geisler* factors support the conclusion that capital punishment remains morally acceptable to the people of Connecticut in appropriate circumstances and is not cruel and unusual punishment under the state constitution following the passage of P.A. 12-5.

### III

### SEPARATION OF POWERS

My final concern is that the majority usurps the legislature's power to define crimes and establish punishments. In *Rizzo*, this court recognized that "assessing the propriety of the death penalty is not exclusively the domain of the legislature, and that this court has an

independent duty to determine that the penalty remains constitutionally viable as the sensibilities of our citizens evolve. See *Atkins* v. *Virginia*, supra, 536 U.S. 312–13; *State* v. *Ross*, supra, 230 Conn. 249. In so doing, however, we must *exercise our authority with great restraint*; *State* v. *Ross*, supra, [230 Conn.] 249; and refrain from interfering with democratic processes unless there is compelling reason to disagree with the judgment reached by the citizenry and its legislatures. *Atkins* v. *Virginia*, supra, 313. Moreover, it is clear that [r]easonable people of good faith disagree on the morality and efficacy of capital punishment; *Baze* v. *Rees*, [553 U.S. 35, 61, 128 S. Ct. 1520, 170 L. Ed. 2d 420 (2008) (opinion announcing judgment)]; and that the value of [that sanction], and its contribution to acceptable penological goals, typically is a complex factual issue the resolution of which properly rests with the legislatures . . . . *Kennedy* v. *Louisiana*, [554 U.S. 407, 441, 128 S. Ct. 2641, 171 L. Ed. 2d 525 (2008)]; see also *Roper* v. *Simmons*, [543 U.S. 551, 571, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005)] ([i]n general we leave to legislatures the assessment of the efficacy of various criminal penalty schemes); *Gregg* v. *Georgia*, supra, 428 U.S. 175 [opinion announcing judgment] ([i]n a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people . . .); cf. *Baze* v. *Rees*, supra, 69 (Alito, J., concurring) ([p]ublic policy on the death penalty, an issue that stirs deep emotions, cannot be dictated by the testimony of an expert or two or by judicial findings of fact based on such testimony). We therefore conclude that, as long as there remains powerful evidence of strong public support for the death penalty in the form of long-standing laws enacted by the democratically elected representatives of this state and other jurisdictions within the United States, we will not attempt to discern a contrary view of the public will, or to answer complex policy questions best answered by the legislative process, by choosing among the competing opinions of interest groups and individuals whose views are not necessarily in accord with those of the general population." (Emphasis added; internal quotation marks omitted.) *State* v. *Rizzo*, supra, 303 Conn. 197–98.

The foregoing view was expressed by this court, including the author of the majority opinion in the present case, a mere three and one-half years ago. For the majority now to ignore the court's recent precedent and to decide that capital punishment is impermissible under the Connecticut constitution, especially when the legislature has clearly expressed its intent that all presently sentenced offenders remain subject to the penalty, is inexplicable. See *State* v. *Darden*, supra, 171 Conn. 679–80 ("it must be remembered that the constitution assigns to the legislature the power to enact laws defining crimes and fixing the degree and

method of punishment and to the judiciary the power to try offenses under these laws and [to] impose punishment within the limits and according to the methods therein provided").

The majority's decision is especially disturbing in light of the fact that it is essentially a moral decision rather than a legal one. See, e.g., *District Attorney* v. *Watson*, 381 Mass. 648, 693, 411 N.E.2d 1274 (1980) (Quirico, J., dissenting). In other words, the majority determines that capital punishment is unconstitutional because it is "so out of step with our contemporary standards of decency as to violate the state constitutional ban on excessive and disproportionate punishment," even though, only three and one-half years ago, this court reached the opposite conclusion. As a justice of the highest court in a neighboring jurisdiction stated in similar circumstances, foreshadowing the views expressed in *Rizzo*: "If this court is to determine the constitutionality of the death penalty in light of contemporary moral standards, I believe it must, at a minimum, award great deference to the legislative judgment implicit in the passage of the statute that contemporary moral standards support the punishment in certain circumstances. . . . Judicial inquiry does not extend to the expediency, wisdom or necessity of the legislative judgment for that is a function that rests entirely with the lawmaking department. . . . By substituting its view of contemporary standards for the view implicitly expressed by the [l]egislature, the court infringes on the [l]egislature's prerogative to define crimes and establish the terms of punishment." (Citations omitted; internal quotation marks omitted.) *District Attorney* v. *Watson*, supra, 693–94 (Quirico, J., dissenting). Significantly, the opinion of the dissenting justice in Massachusetts was vindicated when the citizens of Massachusetts promptly rejected the court's decision that a state statute providing for the death penalty was unconstitutional on its face by amending the Massachusetts constitution to expressly provide that the death penalty was not forbidden. See *State* v. *Ross*, supra, 230 Conn. 250 n.30. Moreover, to my knowledge, no other state court decision determining that capital punishment is unconstitutional under a state constitution has avoided abrogation by constitutional amendment.[20]

In *State* v. *Ellis*, supra, 197 Conn. 450–51 n.13, the court noted that Swift had recognized the legislature's authority to define crimes and establish punishments in the early 1800s. The court stated: "Prior to 1821, manslaughter was punished by methods which might be described as medieval. The 1808 statute provided that 'whatsoever person shall be guilty of the crime of man-slaughter . . . shall forfeit to the public treasury of this state, all the goods and chattels to him or her belonging . . . and be further punished by whipping on the naked body, and be stigmatized, or burnt on the hand with the letter *M*, on a hot iron, and shall also be

forever disabled from giving any verdict or evidence in any of the courts within this state.' . . . General Statutes (1808 Rev.) tit. 66, c. 7." *State* v. *Ellis*, supra, 450 n.13. The court then observed that, even though Swift had "inveighed against this barbaric form of punishment"; id.; because "the ways of committing manslaughter differed greatly in criminality and . . . the punishment [should have been] varied and proportioned accordingly . . . [h]e concluded that in this enlightened period, when reason and science [had] dispelled the gloom of prejudice and superstition, it [was] to be hoped that the *legislature* [would] soon enact more rational and consistent laws on this subject." (Citation omitted; emphasis added; internal quotation marks omitted.) Id., 451 n.13. The legislature's authority to establish punishments, within proper limits, has been expressly acknowledged in *Rizzo* and in other cases. See, e.g., *State* v. *Rizzo*, supra, 303 Conn. 197–98; *State* v. *Williams*, 157 Conn. 114, 121, 249 A.2d 245 (1968), cert. denied, 395 U.S. 927, 89 S. Ct. 1783, 23 L. Ed. 2d 244 (1969); *State* v. *McNally*, 152 Conn. 598, 603, 211 A.2d 162, cert. denied, 382 U.S. 948, 86 S. Ct. 410, 15 L. Ed. 2d 356 (1965); see also *State* v. *Kreminski*, 178 Conn. 145, 153, 422 A.2d 294 (1979); *State* v. *Kyles*, 169 Conn. 438, 444, 363 A.2d 97 (1975); *State* v. *Levy*, 103 Conn. 138, 148, 130 A. 96 (1925). Accordingly, this court must proceed with great caution when exercising its authority to determine that a punishment is unconstitutional.

Finally, the effect of the majority's decision on the relevant constitutional provisions and statutes referring to capital punishment in Connecticut is not their repeal or elimination, but their unenforceability. As this court stated in *State* v. *Travelers Ins. Co.*, 73 Conn. 255, 47 A. 299 (1900), aff'd, 185 U.S. 364, 22 S. Ct. 673, 46 L. Ed. 949 (1902), "[n]o court can directly set aside an [a]ct of the legislature; and the power to indirectly invalidate legislation is one which in the nature of things can exist in the judicial department only under a constitution in the American sense, and is limited by the authority from which it is derived; it is not a power of veto or revision, but purely the judicial power of interpretation." Id., 259. Thus, both the legislature and this court are free to revisit the issue, as it has been asked to do in several pending cases in the context of a claim that capital punishment is per se unconstitutional.

For the foregoing reasons, I dissent.

[1] Unless otherwise noted, all future references in this opinion to the constitutionality of capital punishment in Connecticut are to its constitutionality under the state constitution.

[2] In *Ross*, the court stated that, in reviewing a death penalty statute, "the due process clauses of our state constitution incorporate the principles underlying a constitutionally permissible death penalty statute that the United States Supreme Court has articulated in [prior] cases . . . . These principles require, as a constitutional minimum, that a death penalty statute, on the one hand, must channel the discretion of the sentencing judge or jury so as to [ensure] that the death penalty is being imposed consistently and reliably and, on the other hand, must permit the sentencing judge or jury

to consider, as a mitigating factor, any aspect of the individual defendant's character or record as well as the circumstances of the particular offense." (Citations omitted.) *State* v. *Ross*, supra, 230 Conn. 252.

[3] Although I am not convinced that the *Geisler* test is the proper standard for assessing state constitutional claims in the first instance; see footnote 7 of this opinion; this court consistently has applied that framework in prior cases, and there is no reason to depart from that framework in the present case.

[4] I agree with Chief Justice Rogers' discussion of whether the death penalty serves any legitimate penological goals and with parts IV through XIV of her dissenting opinion, in which she addresses the analysis in the concurring opinion of Justices Norcott and McDonald of whether the death penalty is arbitrary and discriminatory, as well as the defendant's other claims. I also generally agree with Justice Espinosa's dissenting opinion.

[5] The majority claims that the defendant raised a general challenge to the constitutionality of capital punishment because one of the stated grounds for reconsideration in his motion was that P.A. 12-5 "represents a fundamental change in the contemporary standard[s] of decency in Connecticut and a rejection of the penological justifications for the death penalty, rendering the death penalty now cruel and unusual punishment . . . ." (Internal quotation marks omitted.) To the extent the defendant relied on the contemporary standards of decency in Connecticut as a basis for that argument, however, he did so in the context of his challenge to capital punishment under the eighth amendment to the federal constitution and not under the Connecticut constitution.

The defendant devoted only four pages in his brief to a claim that, "even if an execution following passage of [P.A. 12-5] did not violate the eighth amendment, it would clearly violate . . . the constitution of Connecticut." In this argument, the defendant relied primarily on cases from other jurisdictions in which the court considered whether the enactment of a statutory provision prohibiting the imposition of capital punishment on a certain category of offenders applied retroactively to similar offenders who were sentenced to death *before* the statute's enactment. See *Fleming* v. *Zant*, 259 Ga. 687, 690, 386 S.E.2d 339 (1989) (intellectually disabled offender); *Saylor* v. *State*, 808 N.E.2d 646, 647–48 (Ind. 2004) (offender convicted and sentenced to death under procedure subsequently revised so that offender would no longer be eligible for capital punishment); *Cooper* v. *State*, 540 N.E.2d 1216, 1219–20 (Ind. 1989) (offender who committed crime when she was under sixteen); *State* v. *Bey*, 112 N.J. 45, 101–102, 548 A.2d 846 (1988) (juvenile offender); *Van Tran* v. *State*, 66 S.W.3d 790, 792 (Tenn. 2001) (intellectually disabled offender). In a similar vein, the defendant's reference to the views of prior dissenting justices of this court was not in support of a claim that the death penalty is generally unconstitutional but was intended to show that "the concerns expressed in those opinions are increased exponentially here, where any death sentence would rest on [the] wholly *arbitrary* factor" of the date of the offense following the passage of P.A. 12-5. (Emphasis added.) The defendant's discussion of policy considerations also focused on the unfairness of retaining capital punishment for a small number of offenders while repealing the punishment for future offenders.

During oral argument on the motion for reconsideration, the defendant continued to argue that P.A. 12-5 was unconstitutional when he contended that the provision to implement the prospective repeal by the date of the offense was arbitrary under the state constitution and a violation of eighth amendment principles. Indeed, Justice Palmer, in particular, queried the defendant's appellate counsel repeatedly as to why the distinction in P.A. 12-5 between two classes of people, namely, future offenders who otherwise might be subject to capital punishment and current death row inmates, did not require an equal protection analysis. He also asked numerous questions regarding the severability of the retention provision from the remainder of the act if this court should deem the retention provision unconstitutional. Accordingly, a fair reading of the defendant's brief and oral argument does not support the majority's conclusion that the defendant raised a general challenge to the constitutionality of capital punishment, which, in the past, has always been treated as a per se challenge.

[6] This contrasts with *Furman* v. *Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), in which Justice Brennan suggested in his concurring opinion that there are four principles by which the United States Supreme Court should determine whether a particular punishment is cruel and unusual under the federal constitution. See id., 271–80 (Brennan, J., concurring). These are whether the punishment is "so severe as to be degrading to the dignity of human beings"; id., 271; is inflicted in an arbitrary fashion; id., 274; is "unacceptable to contemporary society"; id., 277; and is clearly unnecessary because it is excessive. Id., 279.

[7] Although I have expressed reservations in recent years regarding the propriety of applying *Geisler* in its current form to state constitutional

claims; see, e.g., *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 442, A.3d (2015) (*Zarella, J.*, concurring); *State* v. *Rizzo*, supra, 303 Conn. 202 (*Zarella, J.*, concurring); *Connecticut Coalition for Justice in Education Funding, Inc.* v. *Rell*, 295 Conn. 240, 400–401 n.2, 990 A.2d 206 (2010) (*Zarella, J.*, dissenting); I review the defendant's constitutional claim in the present case under *Geisler* because it was the legal framework this court adopted in *Ross* and applied in *Rizzo*.

[8] Article first, § 1, of the Connecticut constitution provides in relevant part: "All men when they form a social compact, are equal in rights . . . ."

[9] The majority relies on *People* v. *Anderson*, 6 Cal. 3d 628, 637–39, 493 P.2d 880, 100 Cal. Rptr. 152, cert. denied, 406 U.S. 958, 92 S. Ct. 2060, 32 L. Ed. 2d 344 (1972), in which the Supreme Court of California determined that the death penalty was per se unconstitutional under the state constitution, for the proposition that "incidental references to [the] death penalty in [a] state constitution merely acknowledge that [the] penalty was in use at [the] time of drafting and do not enshrine its constitutional status as standards of decency evolve . . . ." The court in *Anderson*, however, adopted a far more nuanced position than the majority portrays. Although the court stated that references in the California constitution to capital punishment "do no more than recognize [the] existence [of capital punishment] at the time of their adoption"; *People* v. *Anderson*, supra, 638; the court also explained that the references to capital punishment were contained in the original state constitution in 1849, carried over into the constitution of 1879, and merely shifted into a different section of the constitution in 1966. Id., 638–39. The court then added: "Nothing in the legislative counsel's analysis, in the arguments for and against the revisions, or in the Secretary of State's official description of the ballot measure suggested to the voter that approval of [p]roposition 1-a [amending and revising various provisions of the state constitution] in the election of November 8, 1966, would affirm the continuance of capital punishment." Id., 639. The court thereby indicated that, if the ballot measure had included such a suggestion, it would not have regarded the constitutional references to capital punishment as merely incidental. In contrast, Connecticut's constitutional history contains recent evidence of public support for capital punishment. As discussed in part II B of this opinion, delegates to the 1965 constitutional convention expressly rejected a constitutional amendment to abolish capital punishment, thus indicating continued approval of capital punishment almost 150 years following the adoption of the 1818 constitution. *Anderson* thus fails to support the majority's contention that the text of the Connecticut constitution is irrelevant because it does not reflect contemporary values. See *Glossip* v. *Gross*, U.S. , 135 S. Ct. 2726, 2747, 192 L. Ed. 2d 761 (2015) (Scalia, J., concurring) ("[i]t is impossible to hold unconstitutional that which the [c]onstitution explicitly *contemplates*" [emphasis in original]).

[10] In the colony of Connecticut, capital punishment applied to twelve crimes in 1642 and seventeen crimes in 1650. L. Goodheart, The Solemn Sentence of Death: Capital Punishment in Connecticut (2011) pp. 10–11. In the colony of New Haven, capital punishment applied to twenty-three crimes in 1656. Id., p. 12. After the two colonies merged in 1665, the punishment applied to eighteen crimes. Id., p. 13.

[11] In Connecticut, capital punishment applied to nineteen crimes in 1702 and to twelve crimes in 1750. L. Goodheart, supra, pp. 45, 49.

[12] Capital punishment applied to eleven crimes in 1784 and to six crimes in 1821. L. Goodheart, supra, pp. 75, 79.

[13] Each treatise consisted of two volumes published in successive years. Swift's first treatise was published in 1795 (volume I) and 1796 (volume II). His second treatise was published in 1822 (volume I) and 1823 (volume II).

[14] In the preface to the updated treatise, Swift noted that his earlier treatise was "imperfect" because it had been written at the beginning of his career, and he had wanted to revise it since the time of its publication. 1 Z. Swift, A Digest of the Laws of the State of Connecticut (1822) p. 4. He explained that he thus had devoted his retirement years to "revis[ing] and enlarg[ing] the work of [his] early age, with the hope to render it more useful, by the knowledge acquired by long experience." Id. He added: "So great have been the changes and improvements in our jurisprudence since the former work was written, that I have retained little more than the plan, and this may be considered as a new work." Id.

[15] The majority's rejection of the views expressed in Swift's updated treatise as being "of little moment" is another example of the majority's refusal to acknowledge the historical facts when they are inconsistent with its reasoning. Footnote 29 of the majority opinion. Swift's declaration in the

preface of his updated treatise that he sought to revise his earlier work in accordance with his "long experience" dispels any notion that Swift changed his views in the three or four years following the constitutional convention, especially when one considers that he also served during those years as the chairman of the committee to revise the General Statutes; see *State* v. *Ellis*, 197 Conn. 436, 451 n.13, 497 A.2d 974 (1985); to ensure *conformance* with the new constitution. See General Statutes (1821 Rev.) preface, p. viii.

The majority also ignores this court's repeated recognition that "Swift's writings are particularly significant to our state constitutional jurisprudence. He was instrumental in encouraging the public and the legislature to convene the constitutional convention of 1818. Although he pursued a written constitution in order to achieve separation of powers, his participation as a leader is significant. . . . [S]ince . . . Swift was the chief [justice] and the state's leading judicial scholar at the time of the convention, his views on the law take on great significance in determining what the framers had in mind when adopting the language of the constitution." (Citation omitted; internal quotation marks omitted.) *State* v. *Ross*, supra, 230 Conn. 291 (*Berdon, J.*, dissenting in part); accord *State* v. *Joyner*, supra, 225 Conn. 490 (*Berdon, J.*, dissenting).

Finally, Justice Palmer himself has quoted extensively from Swift's treatises and has characterized Swift as an important legal authority of his day. See, e.g., *State* v. *Courchesne*, 296 Conn. 622, 676–77, 684–85 n.41, 998 A.2d 1 (2010) (relying on Swift's writings, describing Swift as authoritative commentator and stating that " 'Swift led the development of an American [as distinct from an English] common law' " and that "this court repeatedly and consistently has relied on Swift for the purpose of ascertaining this state's common law in a wide variety of contexts"). Accordingly, for all of these reasons, the majority's dismissal of Swift's updated treatise as "of little moment" is incomprehensible. Footnote 29 of the majority opinion.

[16] Insofar as the majority suggests that this is not true because "[t]he deciding vote in favor of a retrial [in the case] was cast by a member of the governing council who 'was not willing that a man should be [hanged as a result of] his vote' "; text accompanying footnote 30 of the majority opinion, quoting J. Zeldes, "Connecticut's Most Memorable 'Good for Nothing Rascal' in This 'Land of Steady Habits,' " 80 Conn. B.J. 367, 394 (2006); the majority simply misunderstands the circumstances. The council member who cast the deciding vote to retry the case did not do so because he believed the verdict in the prior trial had been wrong or because he was against the imposition of capital punishment. Rather, he wanted to give Lung another opportunity to present his case unclouded by the prior alleged procedural irregularities stemming from the severity of the punishment.

[17] Swift was chosen by the legislature in 1820 to chair the committee directed to perform this task. *State* v. *Ellis*, supra, 197 Conn. 451 n.13.

[18] The court nonetheless recognized that its conclusion that the death penalty is not cruel and unusual punishment did not mean that the penalty may be imposed without any constitutional constraints. See *State* v. *Ross*, supra, 230 Conn. 251–52; see also footnote 2 of this opinion.

[19] Prosecutors, in particular, and sentencing juries in capital cases, are not randomly selected representatives of the people of Connecticut.

[20] Although the California Supreme Court also declared its state's death penalty statute unconstitutional under the California constitution; see *People* v. *Anderson*, 6 Cal. 3d 628, 651, 656–57, 493 P.2d 880, 100 Cal. Rptr. 152, cert. denied, 406 U.S. 958, 92 S. Ct. 2060, 32 L. Ed. 2d 344 (1972), the California constitution subsequently was amended to reinstate capital punishment. See *People* v. *Frierson*, 25 Cal. 3d 142, 173, 599 P.2d 587, 158 Cal. Rptr. 281 (1979).